In the Matter of ROSARIO CHIRILLO et al., Appellants. RUTH TAYLOR, as Commissioner of Public Welfare of Westchester County, Respondent.

Argued April 10, 1940; decided July 24, 1940.

*Morris Shapiro, Harry Katz* and *Samuel Slaff* for appellants.

*Osmond K. Fraenkel* for American Civil Liberties Union, *amicus curiæ.*

*Elliott L. Biskind* and *Louis Eisenstein* for New York City Chapter of National Lawyers Guild, *amicus curiæ.*

*William A. Davidson, County Attorney (Henry Epstein* and *Umberto D'Alessandro* of counsel), for respondent.

*John J. Bennett, Jr., Attorney-General (Henry Epstein, John F. X. McGohey* and *Nathaniel Fensterstock* of counsel), for State of New York.

*William C. Chanler, Corporation Counsel,* for City of New York, *amicus curiæ.*

LOUGHRAN, J. In 1926 Rosario Chirillo became a citizen of the United States by naturalization. He lived thereafter at Wooster, Ohio, until January, 1939, when he removed

with his wife and minor children to the town of Mamaroneck, Westchester county, New York. Beginning in September, 1939, the family received public relief from the Commissioner of Public Welfare of Westchester County in installments amounting altogether to $116.60.

Upon a petition of the Commissioner, the County Court of the county on February 19, 1940, made an order as follows:

" Ordered, that the respondents, Rosario Chirillo and Josephine Chirillo, his wife, together with the minor children of said Rosario Chirillo and Josephine Chirillo, namely: Louis Chirillo, Mary Chirillo, Joseph Chirillo and Joseph Calabre, leave the State of New York within twenty (20) days after the service upon said Rosario Chirillo and Josephine Chirillo, his wife, individually and as parents and natural guardians of the aforesaid minor children, and on each of the said minor children, Louis Chirillo, Mary Chirillo, Joseph Chirillo and Joseph Calabre, of a certified copy of this order; and it is further

" Ordered, that upon the failure of said respondents to leave the State of New York as hereinabove provided, the Sheriff of Westchester County be and he hereby is ordered and directed to remove the said respondents herein, namely: Rosario Chirillo and Josephine Chirillo, his wife, and the minor children, Louis Chirillo, Mary Chirillo, Joseph Chirillo and Joseph Calabre, from their present residence in the Town of Mamaroneck, Westchester County, New York, to the City of Wooster, County of Wayne, State of Ohio."

This order was made in professed exercise of the jurisdiction conferred by section 71 of the Public Welfare Law (Cons. Laws, ch. 42) which reads as follows:

" Removal of non-resident and alien poor to other states and countries. When any person who is an inmate of any public home or is otherwise cared for at the expense of the state or of any public welfare district belongs to or has friends willing to support him or to aid in supporting him in any other state or country, the state department of social welfare may cause his removal to such state or country,

provided, in the judgment of the state department of social welfare, the interest of the state and the welfare of such person will be thereby promoted. After notification of the proposed removal, if such person shall refuse to be so removed, the commissioner of the public welfare district wherein such person is being cared for may, with the prior approval of the state department, apply to the county judge of his county for the issuance of an order to the sheriff of the county in which such person is being cared for, or to some other person or persons, to remove the person to the state or country or district therein legally responsible for or willing to support him, and cause his removal thereto. The expense of such removal shall be paid from the state treasury on the warrant of the comptroller pursuant to a verified account submitted by the proper officer of the state department of social welfare."

Contending that the provisions of section 71 of the Public Welfare Law violate the Federal Constitution, the Chirillo family have as of right appealed from the order of removal of the County Court of Westchester County directly to this court as in a case " where the only question involved on the appeal is the validity of a statutory provision of the state or of the United States under the constitution of the state or of the United States." (N. Y. Const. art. VI, § 7, subd. 3; Civ. Prac. Act, § 588, subd. 3.)

What is meant by section 71 of the Public Welfare Law when it speaks of a person who " belongs to * * * any other state or country? " The answer of the court below was that a person " belongs to " that State or country where he has the right to have his need relieved under poor laws. The court found that the appellants had their poor law settlement at Wooster, Ohio — where, as the court also found, the relief authorities were willing to support the appellants on their return. Likewise the court was of opinion that the phrase " non-resident poor," as used in section 71, means indigent persons who have not gained a settlement in a town or city of this State by continuous residence for one year without receiving certain types of

public relief or care. (See Public Welfare Law, art. VII, particularly, § 56.)

This construction of section 71 is denied by the appellants. It is argued for them that " residence " has here its ordinary legal meaning (*i. e.*, domicile), and that consequently they must be taken to be residents of Westchester county, New York. Questions of the intent and scope of the statute are thus major issues.

*Amici curiœ* attack section 71 with the claim that it attempts to direct the compulsory removal of any indigent person from this State to any other place where he " has friends willing to support him or to aid in supporting him." It may be, however, that section 71 will bear the restrictive interpretation that the consent of an indigent person is essential to his deliverance to such chance kindred,— if indeed the section must necessarily stand or fall in its entirety.

The foregoing plainly shows that this case is not one " where the only question involved on the appeal is the validity of a statutory provision of the state or of the United States under the constitution of the state or of the United States." I am aware that there are cases in which this court on a direct appeal has determined the constitutional validity of a statute upon the basis of a construction thereof made by a court of first instance with the assent of all parties to the controversy. (Cf. *Doubleday, Doran & Co. v. Macy & Co.*, 269 N. Y. 272.) In respect of that edge of our jurisdiction, it seems to me to be enough to say that such a case is not now before us.

The appeal should be dismissed, without costs.

LEHMAN, Ch. J. (concurring). I concur in the opinion of LOUGHRAN, J.

In litigation between private parties, the litigants may ordinarily agree upon the construction of a statute on which a claim of a private right or obligation is based, and either party may confine attack or defense to a challenge of the validity of the statute under the Constitution of the United States or the Constitution of the State of New York.

When, in such litigation, a party aggrieved by a decision of a court of record of original jurisdiction, appeals directly to this court in accordance with the provisions of subdivision 3 of section 588 of the Civil Practice Act, he cannot assert that the decision is erroneous on any ground except the ground that the court has erred in giving or denying effect to a statute which has been challenged as unconstitutional. Since the court may not review any other question upon such appeal and the appellant may not urge any other question, the court must assume that in terms the statute defines the rights and obligations of the parties in the situation presented and it must accept a construction of the statute upon which the parties have agreed. (*Doubleday, Doran & Co.* v. *Macy & Co.*, 269 N. Y. 272.) If, then, only the constitutional question remains and that question is decisive, the court must entertain the appeal not as matter of discretion but because the appellant may, under the provisions of the statute, appeal " as of right;" if any other question remains which might be decisive, the court must dismiss the appeal for the mandate may not be disregarded that " on any such appeal only the constitutional question shall be considered and determined by the court." (N. Y. Const. art. VI, § 7, subd. 3.)

The order of the court of original jurisdiction from which this appeal was taken, is not made in a litigation between private parties and concerns much more than the rights and obligations of private parties. Here officers of the State and county assert a power to remove to another State persons who claim that they are residents of this State and who challenge the power of these officers to compel their removal. The order which we are asked to review directs removal and rejects the claim of the appellants that removal violates rights guaranteed by the Constitution of the United States and the Constitution of the State. The public must look to the courts for the vindication of the rights of the individual guaranteed by law and the vindication of governmental powers exercised according to law for the promotion of the public welfare. The

courts must define the limits of the powers of a public officer and the rights of the individual and in a dispute about these limits the public may have an interest transcending the interest of the parties to the dispute.

The powers of public officers are conferred by statute but no statute can confer upon a public officer a power which under the Constitution of the United States is denied to the State itself, or which under the Constitution of this State may not be conferred by the Legislature upon an officer of the State. Consent may at times bar an individual from asserting thereafter a right to redress for wrong done by a public officer but no consent or stipulation, either express or implied, can enlarge or restrict the powers of an officer which are defined by law, just as no consent or stipulation can compel or justify sanction by a court of an act of a public officer prohibited by the Constitution. Here the court has directed the removal of the appellants and certainly no court may order such removal if, under a proper construction of the statute, no power of removal is conferred, even though the parties may agree in placing a broader construction upon the statute. In litigation involving only private rights, the parties may usually define the issues of law or fact which they desire to submit to the court; and even make the rules which shall be the measure of their reciprocal rights and obligations; in a proceeding brought to remove these appellants, the court had no power to grant an order to the Sheriff to remove the appellants unless such an order was authorized by the law and no limitation of the issues by consent of the parties or agreement of the parties can give to the court power to order the Sheriff to do an act without authority of law, nor may this court affirm an order of a court of first instance which directs a Sheriff to perform an act not authorized by law.

These are fundamental principles which have always governed courts in their control or review of acts of State officers. These principles dictate the conclusion that upon this appeal more than " the validity of a statutory provision " is involved. What we have said and decided in

appeals from judgments involving only the relations of private parties, like *Doubleday, Doran & Co.* v. *Macy & Co.* (*supra*) have no application here. The draftsmanship of the statute is imperfect. Under a construction, which may, at least, be argued, the statute would not apply to these appellants and even if we should find that the Legislature has power to provide for the removal of persons in the situation of these appellants, we still could not affirm an order directing the Sheriff to remove these appellants unless we considered the construction of the statute and determined that the statute was intended to authorize such removal.

Moreover, we cannot properly determine the validity of the statute under the Constitution if we confine our consideration to the clauses which might apply to the " removal of a class of persons situated as are these appellants." While it is true these appellants may not complain that other clauses deprive another class of persons of rights guaranteed by the Constitution, yet the entire statute might be rendered unconstitutional if excision of clauses which are void would go so deep that the intended purpose of the statute would be frustrated. Whether these clauses would be unconstitutional and how far excision of the void would destroy the intended purpose of the statute might again depend largely upon construction of statutory language and we cannot consider any question of construction upon this appeal.

For these reasons the appeal should be dismissed, without costs.

FINCH, J. (dissenting). It is submitted that we should consider and decide the constitutional question.

This is a direct appeal from an order of Special Term of the Westchester County Court, directing the removal, at State expense, of appellants from Westchester county, in this State, to Wooster, Ohio, their legal residence, upon the ground that the statute under which these proceedings were commenced (Public Welfare Law, § 71) is in violation of the Constitution of the United States.

This special proceeding was started in the interest of the public welfare on the petition of the Commissioner of Public Welfare of Westchester County.

The following facts are taken from the record: Rosario Chirillo " is 62 years old and has complained of and requested medical aid for his rheumatic condition." His wife, who is 56, also " mentions poor health, particularly attacks of gallstones in the past, feeling too ill to be working, and chronic bronchitis." One son, " Louis, shows serious symptoms of mental difficulty " and will need " permanent support." His brother " Anthony, is at present in Maslin State Hospital in Ohio " because of a psychiatric difficulty.

In October, 1926, Rosario became a citizen of the United States by naturalization at Wooster, Ohio. All his children were born there, and through his trade as a cobbler he has acquired two parcels of real property. Furthermore, in Wooster, at various times, appellants have been recipients of public benefaction. In January, 1939, Chirillo sold all his belongings in Wooster except his realty, and moved to the town of Mamaroneck, Westchester county, in this State, claiming that he wished to establish a permanent home there. Rosario Chirillo insists that his purpose in moving from the State of Ohio to the State of New York was to be near a married son and a married daughter living in Mamaroneck. Upon arrival, Rosario Chirillo resumed his trade, but by September of the same year applied for relief to the local relief office. Four monthly payments were made to him, and these removal proceedings were commenced. In answer to an inquiry from the Westchester County Department of Family and Child Welfare, the authorities in Ohio wrote as follows on November 10, 1939: " The above family has misstated the facts. They are residents of Wooster, Ohio. We authorize their return at your expense, although if I were in your place, I would refuse relief and tell them, if they want to get back to Ohio, they will have to pay their own way. There was no valid reason for their going out there. He had a small shoe repair business here and during the slack seasons we did grant a small

amount of relief. He owns more property than he has told you about."

On the basis of the above letter, plus the investigation by the Westchester County Welfare Department, and its own investigation, the State Department of Social Welfare gave its approval to these removal proceedings, and found in part as follows: " They own property in Ohio and have previously received assistance there. The Ohio officials have authorized the return of the family and there is every reason to believe they will make a better adjustment there than here. Mr. Chirillo was able to obtain work on a seasonal basis in Ohio and his possibilities would seem to be better there. * * * This office is definitely of the opinion that this family should be returned to its place of legal settlement * * *."

" From their married children in Mamaroneck, New York, Mrs. Carmela di Orio, 827 Underhill Avenue, Mamaroneck, and John Chirillo, same address, they can expect no material help, since the former has four children and is the wife of a man employed at $4.00 a day by the Town of Mamaroneck, and the latter, formerly on W. P. A., is now receiving relief."

The County Court found that appellants did not question the fact that their legal settlement was in Wooster. The court also found that the authorities there acknowledged responsibility for the family and consented to their return, and that appellants' showing of income was only temporary, and a denial of the order might result in a loss of their legal settlement in Ohio. In consequence the court granted the application for removal, except as to a daughter over twenty-one who was found to be self-supporting.

Section 71 of the Public Welfare Law provides: " Removal of non-resident and alien poor to other states and countries. When any person who is an inmate of any public home or is otherwise cared for at the expense of the state or of any public welfare district belongs to or has friends willing to support him or to aid in supporting him in any other state or country, the state department of social welfare

may cause his removal to such state or country, provided, in the judgment of the state department of social welfare, the interest of the state and the welfare of such person will be thereby promoted. After notification of the proposed removal, if such person shall refuse to be so removed, the commissioner of the public welfare district wherein such person is being cared for may, with the prior approval of the state department, apply to the county judge of his county for the issuance of an order to the sheriff of the county in which such person is being cared for, or to some other person or persons, to remove the person to the state or country or district therein legally responsible for or willing to support him, and cause his removal thereto. The expense of such removal shall be paid from the state treasury on the warrant of the comptroller pursuant to a verified account submitted by the proper officer of the state department of social welfare."

Upon this appeal appellants urge as their first point that, because the Chirillos crossed the New York State line with the intention of becoming permanent residents in New York State, therefore, they are residents of New York, and " the statute if applied to the Chirillos who are residents of New York is unconstitutional." Appellants also urge that to remove them to the State of Ohio in accordance with the terms of the above statute would violate their privileges and immunities as citizens of the several States (art. 4, § 2, cl. 1), and as citizens of the United States (Fourteenth Amendment, § 1). Appellants further contend that it would also violate the Fourteenth Amendment of the United States Constitution in denying them due process of law, equal protection of the laws, and lastly would encroach upon the power of Congress to regulate commerce among the several States (art. 1, § 8).

Before proceeding to a consideration of the constitutional objections to the statute, it is claimed that we must dismiss this appeal and not decide the constitutional question urged upon us by all parties to this proceeding. The reason given is that appellants, in addition to the constitutional

issue, have included as a part of the first point in their brief, a claim that section 71 of the Public Welfare Law does not apply to any non-resident who crosses the State with the intention of becoming a resident, and that the statute as applied to non-residents may be emasculated by this simple device.

It is true that the Civil Practice Act, section 588, subdivision 3, places restrictions upon the jurisdiction of the Court of Appeals, among other things, where, as here, there is a direct appeal to this court upon constitutional grounds. The provisions of the Civil Practice Act in this regard are as follows: " As of right, from a judgment or order of a court of record of original jurisdiction which finally determines an action or special proceeding where the only question involved on the appeal is the validity of a statutory provision of the state or of the United States under the constitution of the state or of the United States; and on any such appeal only the constitutional question shall be considered and determined by the court."

The above provision consists essentially of two sentences, the first of which looks to and describes the judgment or order appealed from, and the second of which governs the action of the appellate court in considering the appeal. In other words, the first sentence provides that appeal may be taken from a judgment or order which finally determines an action or special proceeding, where the only question involved on the appeal is the validity of a statutory provision. In the case at bar a record is presented which establishes that the order providing for the removal could not have been granted unless section 71 of the Public Welfare Law had been held constitutional. Before the court could have ordered the removal, the constitutionality of section 71 of the Public Welfare Law was necessarily involved. The order appealed from could not be based upon a ground other than one holding this section constitutional. Under such circumstances there is ample authority to sustain our consideration of the constitutional problem. (*Doubleday, Doran & Co.* v. *Macy & Co.*, 269 N. Y. 272;

Cohen on the Powers of the New York Court of Appeals, p. 162. See, also, *Chambers* v. *B. & O. R. R. Co.*, 207 U. S. 142, 148; *Montana ex rel. Haire* v. *Rice*, 204 U. S. 291, 299.) On the other hand, if the County Court in the case at bar had denied the relief, a different question would have been presented and the decision might have been sustained upon a ground other than that of the validity of the statute under the Constitution. But even in this latter case there is authority permitting a decision of the constitutional question, for we have held that where the court, whose decision is appealed from, has determined that the statute is unconstitutional, and we have grave doubt whether the decision may not be sustained on grounds of construction of the statute rather than on constitutional grounds, yet where the construction of the statute is agreed upon by the court from which the appeal is taken and by all the parties to the proceeding, we will confine ourselves to the constitutionality of the statute and determine its validity. (*Doubleday, Doran & Co.* v. *Macy & Co.*, 269 N. Y. 272.) We have, therefore, interpreted this section of the Civil Practice Act (§ 588, subd. 3) as vesting a discretion in the court to consider the other questions waived, and decide the constitutional question.

In the case at bar the Attorney-General asserts that the only question to be considered is the validity of section 71 of the Public Welfare Law. If the appellants may be held to have urged in the first point of their brief, in addition to the question of constitutionality, a question of construction, then it would seem that in the case at bar appellants must be held to have waived, for the purposes of this appeal, such latter contention for the following reasons. After the judge presiding at the Westchester County Court had held the statute (Public Welfare Law, § 71) constitutionally valid, as he must have done in order to grant the petition, appellants nevertheless moved for reargument with the sole aim to bring before this court on direct appeal the single issue of the validity of section 71 of the Public Welfare Law under the Federal Constitution. The judge at Special

Term, in answer to this motion for reargument, thereupon expressly held the statute constitutional. Thereafter appellants appealed directly to this court with knowledge that the statute conferring jurisdiction upon this court prevented any question being decided by this court other than the validity of the statute under the Constitution. In a case, therefore, where the court of original jurisdiction has held the statute valid and must necessarily have passed upon the constitutional question, and counsel, having appealed directly to this court, attempts to raise other than constitutional questions, this court in its discretion may hold that appellants have waived all other questions except as concerns the Constitution. And particularly is this true where the constitutional issue raised involves a public policy of great importance and where the other question, if raised, would be of secondary importance.

We pass then to a consideration of the validity of section 71 of the Public Welfare Law as it affects these appellants. Upon this appeal we are concerned only with the removal of a class of persons situated as are these appellants, namely, those coming into the State of New York who have had a legal settlement for the purposes of relief in another State of the United States, or, as section 71 puts it, " belongs to * * * any other state * * *." Parenthetically the term " belongs to " has been construed in other States to mean legal settlement the same as held at Special Term and not controverted upon this appeal. (*Town of Washington* v. *Town of Warren*, 123 Conn. 268; *Eden* v. *Southwest Harbor*, 108 Me. 489.) We are not passing either on the constitutionality or on the construction of the provision in the same section where removal is sought upon the ground that the pauper " has friends willing to support him or to aid in supporting him in any other state or country * * *." Section 71 may be valid as to the class of persons in the case at bar and not valid in respect to this other provision. (*New York ex rel. Hatch* v. *Reardon*, 204 U. S. 152, 160.)

We turn then to consider seriatim the constitutional objections advanced against the power of the State of New

York to protect itself against an unprecedented influx of persons on relief or paupers coming from other States. Stating the question in different ways: Is it a privilege or immunity of a citizen of the United States to impose upon any State of his choice the burden of supporting himself and his family before he has satisfied reasonable settlement qualifications, as in the case at bar, of one year? Is there no way short of action by the Congress by which the States, severally or separately, may safeguard themselves from the threat to their security and solvency by incoming numbers of indigent families from other States? Lastly, is a statute designed to safeguard the welfare of the individual and the welfare of the State, and to protect a citizen of the United States from starvation and return him to his former place of settlement, where he will receive succor, a violation of the Constitution of the United States?

We take up first the objection based upon a claimed lack of due process under the Fourteenth Amendment and endeavor to show that section 71 is not unconstitutional but a reasonable exercise of the sovereign police power to attain a proper objective. Obviously, the State of New York, prior to the adoption of the United States Constitution, possessed the powers of a sovereign nation, which included the power to refuse admittance to, or to deport, a person coming from without its borders, whether or not that person crossed the State line with the intention of seeking permanent residence in this State.

Likewise, it is authoritatively settled that the adoption of the Constitution of the United States did not create the power of the State, but only limited such power and, except as so limited, the power of the State remains supreme. (*Carter* v. *Carter Coal Co.*, 298 U. S. 238; 11 Am. Jur. p. 865, § 171.) How then, may we ask, has there been cut down this fundamental police power of the State to enact legislation removing paupers who have not yet acquired a legal settlement in this State, to the place of their last legal settlement? Under the due process clause of the Fourteenth Amendment, the only limitation upon the exercise of the

police power must be that it concerns itself with the promotion of the public welfare through having a real and substantial relation to that end, and shall not be unreasonable, arbitrary or capricious. (*Nebbia* v. *New York*, 291 U. S. 502.) The historical background and present conditions leading up to forcible removal proceedings demonstrate not only their recognized need, but their reasonableness.

From the time of the early common law, the liberty of the pauper has been curtailed in the interests of the welfare of the various communities. In 1350, by statute, the poor were to remain where they were resident, or to be sent to the place of their birth. (4 Holdsworth, History of English Law, p. 390 *et seq.*) In 1662 Parliament enacted the Poor Relief Act (13 and 14 Charles II, ch. 12), which permitted Justices of the Peace, upon complaint of the Overseers of the Poor, to remove by warrant to the place of their last legal settlement, paupers and those " likely to be chargeable to the parish." Counsel for the State of New York has pointed out that this principle of forcible removal of paupers to the place of their last settlement has been projected into the poor law of some thirty States. In 1773 the Colonial Legislature enacted a statute (Colonial Laws of New York, vol. 5, p. 513) practically identical with the above statute enacted in England in 1662, and since that time successive Legislatures of this State have continued statutes along the same line, culminating in section 71 of the Public Welfare Law. In addition, it should be noted that removals have long since been authorized by what is now section 27 of the State Charities Law (Cons. Laws, ch. 55), which in part reads as follows: " State, non-resident and alien poor. The board, and any commissioner or officer of the department may * * * cause to be removed to the state or country from which he came any such non-resident or alien poor found in any such institution or otherwise supported or relieved at public expense."

Action under these sections has long been the policy of the State Department of Social Welfare, under appropriate rules and regulations, which provide, among other pro-

visions, that settlement in the other State must be definitely established, and that an authorization must be received for the return of such person from the authorized officials in the locality of settlement. " Each proposed removal must be considered on a case work basis and a return effected only when the Commissioner of Public Welfare is satisfied that the welfare of the person and the interest of the State will thereby be promoted. State charges requiring temporary relief and care should be given a reasonable opportunity for rehabilitation unless they desire to return voluntarily."

In addition, in all cases there must be considered not only the welfare of the State, but also the welfare of such person, together with a prior approval of the State Department of Social Welfare, and then the approval and action by the Commissioner of Welfare, who may only apply to the County Judge for the issuance of an order of removal and satisfy the County Judge that the statute has been complied with. Then and then only may the County Judge issue the order to remove the person to the State where he has a legal settlement.

In the light of such a statutory history, the objection of arbitrariness and unreasonableness seems weak indeed.

" What is due process of law may be ascertained by an examination of those settled usages and modes of proceedings existing in the common and statute law of England before the emigration of our ancestors, and shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country." (*Twining* v. *State of New Jersey*, 211 U. S. 78, 100.)

" The Fourteenth Amendment, itself a historical product, did not destroy history for the States and substitute mechanical compartments of law all exactly alike. If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." (*Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31.) (See, also *Coler* v. *Corn Exchange Bank*, 250

N. Y. 136; affd., 280 U. S. 218; *Ownbey* v. *Morgan*, 256 U. S. 94.)

As illustrating the need, and showing that the issues herein are not sporadic but of great importance, it appears in Social Security Bulletin 77 of January, 1940, issued by the New York State Department of Social Welfare, that the average home relief granted in Ohio for the month of November, 1939, was $15.99, as against $36.12 in New York, with Westchester county exceeding the average of New York by having an average grant of $40.18, or, to put it more briefly, more than double the amount granted in Ohio. It also appears that the State cost of maintenance of charges in New York State has increased from $323,000 in 1927 to $1,557,000 in 1938 and $2,830,000 in 1939. The monthly average number of State charge cases increased from 3,923 during the fiscal year ending June 30, 1938, to 6,764 in the following fiscal year, or an increase of seventy-two per cent in one year. To a large extent this migration of destitute persons to New York must have been due to the fact that as to average home relief grants, New York ranks first in the country; Ohio ranks nineteenth. Within New York State, Westchester county occupies third position among the sixty-two counties. The city of New York has filed a brief *amicus*, in which it joins with the State in emphasizing " the very great importance * * * of the determination of the question raised," and says that the burden of relief is becoming intolerable and that unless those legally chargeable or willing to assume the burden can share the burden, the result will be " to jeopardize the entire structure of relief in this State."

The statute in the case at bar is thus a reasonable means adopted by the State in order to prevent financial submersion while engaged in caring for the unfortunates and thwarting the spread of sickness, disease and crime.

It is next contended that the power given to the Congress, " To regulate commerce * * * among the several States * * * " (Art. 1, § 8), renders invalid section 71 of the Public Welfare Law. In the consideration of

questions of constitutional construction we are reminded that "unless the party setting up the unconstitutionality of the State law belongs to the class for whose sake the constitutional protection is given * * *," the objections will not be heard, and imaginary cases will not be gone into where, as here, the statute involved may be constitutional as affecting the litigants before the court and may not be constitutional as to others. (*New York ex rel. Hatch* v. *Reardon*, 204 U. S. 152, 160.) While the forcible removal of persons who are public charges and not entitled by reason of lack of length of residence to a legal settlement for relief purposes in the State, may to some extent affect interstate commerce, the case at bar does not present such an interference as is forbidden to the State when exercising the police power in defense of State welfare. It is settled by the authorities that, in the absence of congressional pre-emptions, the police power inherent in the States may be exercised within reasonable restrictions, even though there may be interference with interstate commerce. (*City of New York* v. *Miln*, 11 Pet. [U. S.] 102; *Railroad Co.* v. *Husen*, 95 U. S. 465; *Plumley* v. *Massachusetts*, 155 U. S. 461, 471; *South Carolina State Highway Dept.* v. *Barnwell Bros. Inc.*, 303 U. S. 177; *Arkansas-Louisiana Gas Co.* v. *Dept. of Public Utilities*, 304 U. S. 61; *Welch Co.* v. *New Hampshire*, 306 U. S. 79; *Eichholz* v. *Public Service Commission*, 306 U. S. 268; *Clason* v. *Indiana*, 306 U. S. 439.)

No claim can be advanced that section 71 prevents any person from coming into this State. The statute, as construed below, would seem to have the effect only that, when a person who has not established a legal settlement in this State, applies for public care, he subjects himself to the removal provisions of section 71. Under this law, the State has no power of removal until application is made for State aid. Then, in the interests of the protection of the People from the spread of crime and disease and for the preservation of the financial resources of the State, the latter remits the applicant to the place legally responsible for him under well-settled principles of law.

Appellants further urge that the State had no power to enact section 71 of the Public Welfare Law for the reason that it is in contravention of the provision of the United States Constitution (Art. IV, §. 2, cl. 1) which provides that " The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." As was said by Mr. Justice ROBERTS in *Hague* v. *C. I. O.* (307 U. S. 496), at page 511: " * * * it has come to be the settled view that Article IV, § 2, does not import that a citizen of one State carries with him into another, fundamental privileges and immunities which come to him necessarily by the mere fact of his citizenship in the State first mentioned, but, on the contrary, that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy. The section, in effect, prevents a State from discriminating against citizens of other States in favor of its own."

To hold that this clause protects the right of a citizen to be supported at public expense in any community to which he may journey, it is necessary to find that there is inherent in State citizenship a constitutional right to be supported at public expense free from any limitations whatsoever. This would include a right of the indigent person to live where he will although the crowding into one State may be a menace to society. No such right exists. " Neither aliens nor the citizens of other States are invested by the Constitution with any interest in the common property of the People of this State." (*People* v. *Crane,* 214 N. Y. 154, 161.) Section 71 does not interfere with the right of a citizen of one State to pass through or reside in any other State. Only if on coming from another State he applies for relief at public expense, to which he has no constitutional right, he is bound to accept the relief *cum onere,* or with the limitations of the reasonable provisions of the Public Welfare Law of New York State. If it be for his welfare and for the welfare of the State, he then subjects himself to the possibility of being compelled to return to the State wherein he has a legal settlement. Nor does section 71 of the Public Welfare

Law make any discrimination upon the basis of State citizenship, for all who seek public relief must comply with the same requirements for a legal settlement or be subject to forcible removal. (*Douglas* v. *N. Y., N. H. & H. R. R. Co.*, 279 U. S. 377.)

It is urged that that portion of the Fourteenth Amendment which affords " to any person within its jurisdiction the equal protection of the laws," renders invalid section 71. There is here, however, no invalid classification. (*Heim* v. *McCall*, 239 U. S. 175; *People* v. *Crane, supra.*) In *Barbier* v. *Connolly* (113 U. S. 27), it is said, at page 32: " Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

Section 71 of the Public Welfare Law is only a part of the general plan set up therein. Sections 59 and 59-a authorize the forcible removal of a person from one public welfare district to another within the State. In like manner an indigent person may be removed outside of the State to the State or country in which he has a legal settlement, if the conditions for his welfare and the welfare of the community, as laid down in section 71, are complied with. Thus, all persons who are supported at public expense are subject to removal to the place in which they have their legal settlement, and where they will be supported by the governmental unit responsible for their support. A New York citizen, under its Constitution and laws, may go on relief only at the cost of and subject to removal to his place of settlement. He cannot demand such relief in Montauk except subject to removal to Erie, if he has a legal settlement in the latter place. Thus the petitioner is treated no differently in principle than a citizen in New York under like circumstances.

Lastly, there is no merit to the claim that section 71 is rendered invalid by the constitutional provision that " no State shall make or enforce any law which shall abridge the

privileges or immunities of citizens of the United States * * *." (U. S. Const., 14th Amdt.) It would seem that the privileges and immunities of United States citizenship are none other than those which result from other provisions of the Constitution and from the laws of Congress; that unless some other constitutional provisions or Federal statute prescribes the right claimed to be a privilege or immunity of United States citizens, no further protection may be had by resort to that clause. (*Hague* v. *C. I. O.*, 307 U. S. 496, 519–522; *Slaughter-House Cases*, 16 Wall. [U. S.] 36, 79, 80.) It has been shown above that the statute as herein applied does not contravene other guaranties of the Constitution; nor has the claim been advanced that there is applicable congressional enactment.

Freedom of residence is restricted as to citizens only while on relief. This statute applies whether the citizen is of this State or of another State. Confinement to a poor house or farm may be the result of indigence. No interference is had with the right of any citizen to choose and establish a home. What is controlled is the unrestricted imposition of indigent persons and families without settlement upon a community and State where they cannot establish a home because of their indigent status. Freedom of residence is certainly restricted as to paupers; yet no instance of invalidity has been pointed out as to the poor laws permitting commitment of indigents to poor farms. A condition may often restrict a freedom. Vagrancy is one example; disease is another; and mental deficiency, a third. Such conditions restrict individual rights and freedom in the interest of the right, security and freedom of the rest of the community of the State.

The Public Welfare Law of New York seeks, with due regard to the rights of all those affected, to deal in a humane way with the problem of pauperism. The sovereign police power of the State of New York has been exercised properly and reasonably. Such legislation is permitted by the Constitution of the State, and nothing in the United States Constitution compels a holding that such legislation is invalid.

The order appealed from, in so far as it holds the provisions of section 71 of the Public Welfare Law constitutional, should be affirmed.

LEHMAN, Ch. J., SEARS and CONWAY, JJ., concur with LOUGHRAN, J.; LEHMAN, Ch. J., concurs in separate opinion, in which LOUGHRAN and SEARS, JJ., concur; FINCH, J., dissents in opinion, in which RIPPEY and LEWIS, JJ., concur.

Appeal dismissed.