Vivian Marie **THOMPSON**

v.

Bernard **SHAPIRO**, Commissioner of Welfare of the State of Connecticut.

Civ. No. 11821.

United States District Court
D. Connecticut.

June 19, 1967.

Brian L. Hollander, Hartford, Conn., for plaintiff.

Francis J. MacGregor, Asst. Atty. Gen., Hartford, Conn., for defendant.

Before SMITH, Circuit Judge, and BLUMENFELD and CLARIE, District Judges.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge:

This action was brought in the United States District Court for the District of Connecticut under Title 28 U.S. Code, §§ 2281 and 2284, seeking a declaration that Chapter 299, § 17–2d of the Connecticut General Statutes· is unlawful as in violation of the Constitution of the United States and seeking an injunction against its enforcement and payment of monies unconstitutionally withheld. A three-judge district court was convened pursuant to the statute,·hearings were held, briefs were filed and arguments were made. Notification of pendency of the action was given to the United States because of possible effect on federal statutes, and the Solicitor General notified the court of his decision that the United States would not intervene in the case.[1] The court has considered the stipulations of facts, the testimony taken, the briefs and arguments of the parties, and finds the issues in favor of the plaintiff.

In June of 1966 Vivian Marie Thompson, the plaintiff in this action, and a citizen of the United States, moved from Boston, Massachusetts, to Hartford, Connecticut. Plaintiff's purpose in moving

---

1. The state moved to have the court apply the doctrine of equitable abstention. The court, however, declined to exercise its discretionary equity powers because, "the state statute in question * * * is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question * * *." Harman v. Forssenius, 380 U.S. 528, 534–535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965).

was to live near her mother. Then the mother of one and now the mother of two, plaintiff had been receiving Aid to Dependent Children (ADC) from the City of Boston. Boston discontinued this aid in September because of plaintiff's change of residence. When she applied for similar assistance to Bernard Shapiro, Commissioner of Welfare of the State of Connecticut and the defendant in this proceeding, he denied ADC to her on November 1 because plaintiff, although she was otherwise eligible, had not met the one year residence requirement of Conn.Gen.Stat. § 17–2d which provides as follows:

> "When any person comes into this state without visible means of support for the immediate future and applies for aid to dependent children under chapter 301 or general assistance under part I of chapter 308 within one year from his arrival, such person shall be eligible only for temporary aid or care until arrangements are made for his return, provided ineligibility for aid to dependent children shall not continue beyond the maximum federal residence requirement."

As can be seen, it was to insure continuation of the state's right to receive the substantial payments which the federal government pays to the state for federally approved plans of state aid to needy families with children that § 17–2d is keyed to the federal limitation on residence requirements. At the present time, the Social Security Act, 49 Stat. 627 (1935), as amended, 42 U.S.C. § 602(b) (1959), limits the length of the period of prior residence which a state can require as a condition of eligibility to one year in order to obtain such approval. Thus ADC programs are financed jointly by the state and federal governments and generally the responsibility is shared approximately equally. Some states, like Connecticut, impose the maximum residence requirement allowed by § 602(b); others require a shorter period of residence, or none at all. The Catholic Family Services of Hartford have been supporting plaintiff pending

the outcome of this action; these private payments, however, are below Connecticut's ADC level. See, Harvith, The Constitutionality of Residence Tests for General and Categorical Assistance Programs, 54 Calif.L.Rev. 567, 569 n. 28 (1966) which cites as its authority, National Travelers Aid Ass'n, One Manner of Law—A Handbook on Residence Requirements in Public Assistance 8–13 (1961).

The Welfare Department of the State of Connecticut has promulgated regulations which construe in the following manner the words "without visible means of support for the immediate future" contained in § 17–2d:

1. Persons or families who arrive in Connecticut without specific employment.

2. Those arriving without regular income or resources sufficient to enable the family to be self-supporting in accordance with Standards of Public Assistance.

3. "Immediate future" means within three months after arriving in Connecticut.

    NOTE: Support from relatives or friends, or from a public, private, or voluntary agency for three months after arrival will not satisfy the requirements of the law, which relates to self-support rather than to dependency.

Connecticut Welfare Manual, Vol. 1, Ch. II, § 219.1.

In accord with the above, the regulations further provide:

1. If the application for assistance is filed within one year after arrival in Connecticut, the applicant must establish that he was self-supporting upon arrival and for the succeeding three months thereafter; or

2. If the application for assistance is filed within one year after arrival in Connecticut, the applicant must clearly establish that he came

to Connecticut with a bona fide job offer; or

3. If the application for assistance is filed within one year after arrival in Connecticut, the applicant must establish that he sought employment and had sufficient resources to sustain his family for the period during which a person with his skill would normally be without employment while actively seeking work. Personal resources to sustain his family for a period of three months is considered sufficient. Those who come to Connecticut for seasonal employment such as work in tobacco or short term farming are not deemed to have moved with the intent of establishing residence in Connecticut. Connecticut Welfare Manual, Vol. 1, Ch. II, § 219.2.

Thus, Connecticut withholds ADC for one year to newly-arrived residents unless they come to Connecticut with substantial employment prospects or a certain cash stake.

Plaintiff came to Connecticut with neither the prospect of employment nor the necessary cash stake. It is her contention in this action that Connecticut's denial of ADC results in an unlawful discrimination violative of her constitutional rights under the equal protection and privileges and immunities clauses of the Fourteenth Amendment and the privileges and immunities clause of Art. IV, § 2. Plaintiff contends that Connecticut discriminates against her in favor of three classes of persons: newly-arrived residents with employment, newly-arrived residents with a stake and residents of one year's duration.

■ At the outset, it will be helpful to highlight what is at issue here by excluding what is not. Plaintiff does not argue that Connecticut cannot deny ADC to non-residents. Since plaintiff is a citizen of Connecticut, her reliance on the privileges and immunities clause of Art. IV, § 2 is misplaced; that clause only outlaws discrimination by one state against citizens of another state. People of State of New York v. O'Neill, 359 U.S. 1, 6, 79 S.Ct. 564, 3 L.Ed.2d 585 (1959). We have no question of the state's power under the Tenth Amendment to provide for relief to the indigent, whether by state agencies, town agencies or otherwise. Nor is any claim made here of a local, state or federal constitutional duty to provide aid at all, or any kind or amount of aid. What we do have is a claim that a state may not discriminate by arbitrarily classifying those who shall and those who shall not be provided with aid, because such discrimination violates rights guaranteed by the first section of the Fourteenth Amendment to the Constitution of the United States.

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Plaintiff's argument based on privileges and immunities is premised primarily on the right of interstate travel. That right, so the argument goes, is abridged by Connecticut's practice of denying ADC to those in plaintiff's situation because it chills their mobility. The existence, source and dimensions of the right to travel have been the subject of much constitutional debate. In Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941), the Court struck down a California statute which made it a misdemeanor to bring an indigent non-resident into the state. The rationale of the majority was that the statute violated the Commerce Clause. Mr. Justice Jackson, concurring, would have held that the statute abridged the state citizenship and privilege and immunities clauses of the Fourteenth

Amendment. 314 U.S. at 181–186, 62 S.Ct. 164. Mr. Justice Douglas, joined by Justices Black and Murphy, would also have rested on the privileges and immunities clause. 314 U.S. at 177–181, 62 S.Ct. 164. In the passport cases, which deal with the right of foreign travel, the Court relied on Fifth Amendment notions of liberty. Zemel v. Rusk, 381 U.S. 1, 14, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Aptheker v. Secretary of State, 378 U.S. 500, 505–506, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 126–127, 78 App. D.C. 1113, 2 L.Ed.2d 1204 (1958). Finally, in United States v. Guest, 383 U.S. 745, 759, 86 S.Ct. 1170, 1179, 16 L.Ed.2d 239 (1966), the Court ruled that, "Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need here to canvass those differences further. All have agreed that the right exists." The Court thereby quieted any doubts that might have remained about the existence of the constitutional right

of interstate travel but left unanswered questions regarding its source and dimensions. The defendant contends that the plaintiff is not deprived of the right to travel and to settle in Connecticut since she may do so freely so long as she does not seek welfare benefits until after she has resided here for a year.

■■ Whether or not the state citizenship clause and the privileges and immunities clause [2] are the as yet unnamed source of the right of interstate travel, Mr. Justice Jackson's concurrence in *Edwards*, which as mentioned above was based on those clauses, delineates in timeless language the dimensions of the right.

\* \* \* it is a privilege of citizenship of the United States, protected from state abridgment, to enter any state of the Union, either for temporary sojourn or for the establishment of permanent residence therein and for gaining resultant citizenship thereof. If national citizenship means less than this, it means nothing.

2. To abridge the privileges and immunities clause of the Fourteenth Amendment, the challenged state action must contravene a right inherent in national, as opposed to state, citizenship. Adamson v. People of State of California, 332 U.S. 46, 52–53, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947). The Supreme Court has seldom defined a right of national citizenship. See, Colgate v. Harvey, 296 U.S. 404, 436, 56 S.Ct. 252, 80 L.Ed. 299 (1935) (Stone, J., dissenting) overruled Madden v. Com. of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940); Hague v. CIO, 307 U.S. 496, 520–521 n. 1, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (Stone, J., concurring). According to Mr. Justice Douglas, "judicial reluctance to expand the content of national citizenship \* \* \* has been due to a fear of creating constitutional refuges for a host of rights historically subject to regulation." Bell v. State of Maryland, 378 U.S. 226, 242, 250, 84 S.Ct. 1814, 1827, 12 L.Ed.2d 822 (1964) (Douglas, J., concurring). Nevertheless, there is continuous and abundant judicial recognition that the privileges and immunities clause means something. See the cases cited supra in this footnote and, e. g., United States v. Guest, 383 U.S. 745, 762, 764–767, 86 S.Ct. 1170, 16 L.Ed.2d 239

(1966) (Harlan, J., concurring and dissenting); People of State of New York v. O'Neill, 359 U.S. 1, 12, 13, 79 S.Ct. 564, 3 L.Ed.2d 585 (1959) (Douglas, J., dissenting). See also, Oyama v. State of California, 332 U.S. 633, 640, 68 S.Ct. 269, 92 L.Ed. 249 (1948) which speaks of "privileges as an American citizen". An en banc decision of the Court of Appeals for the Second Circuit, Spanos v. Skouras Theatres Corp., 364 F.2d 161, 170 (2d Cir.), cert. denied, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966), stated among other reasons for its decision, that:

under the privileges and immunities clause of the Constitution no state can prohibit a citizen with a federal claim or defense from engaging an out-of-state lawyer to collaborate with an in-state lawyer and give legal advice concerning it within the state.

As quoted in the text, infra, "If national citizenship means less than" the right "to enter any State of the Union, either for temporary sojourn or for the establishment of permanent residence therein and for gaining resultant citizenship thereof \* \* \* it means nothing." Edwards v. People of State of California, 314 U.S. 160, 181, 183, 62 S.Ct. 164, 171, 86 L.Ed. 119 (1941) (Jackson, J., concurring).

State citizenship is ephemeral. It results only from residence and is gained or lost therewith. That choice of residence was subject to local approval is contrary to the inescapable implications of the westward movement of our civilization. 314 U.S. at 183, 62 S.Ct. at 171.

Any measure which would divide our citizenry on the basis of property into one class free to move from state to state and another class that is poverty-bound to the place where it has suffered misfortune is not only at war with the habit and custom by which our country has expanded, but is also a short-sighted blow at the security of property itself. Property can have no more dangerous, even if unwitting, enemy than one who would make its possession a pretext for unequal or exclusive civil rights. Where those rights are derived from national citizenship no state may impose such a test, and whether the Congress could do so we are not called upon to inquire. 314 U.S. at 185, 62 S.Ct. at 172.

In short, the right of interstate travel embodies not only the right to pass through a state but also the right to establish residence therein.

■ While prior "right to travel cases" have been concerned with absolute proscriptions on movement, *Guest* may be read as proscribing the discouragement of interstate travel. The Court there upheld a paragraph of an indictment based on 18 U.S.C. § 241 which outlaws conspiracy to interfere with rights or privileges secured by the Constitution. The paragraph charged interference with, "The right to travel freely to and from the State of Georgia and to use, highway facilities and other instrumentalities of interstate commerce within the State of Georgia." 383 U.S. at 757, 86 S.Ct. at 1177, 16 L.Ed.2d 239. The Court went on to say that, "if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that

right, then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought." 383 U.S. at 760, 86 S.Ct. at 1179. By employing the words "impede" and "oppress", the Court must have contemplated that the discouragement of interstate travel is also forbidden. Further support for the proposition that the right of interstate travel also encompasses the right to be free of discouragement of interstate movement may be found by analogy to cases proscribing actions which have a chilling effect on First Amendment rights. See Dombroski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2d Cir. 1967). Finally, it should be underscored that the statute invalidated in *Edwards* penalized the sponsor of the indigent, not the indigent himself. In short, whatever its source, the right to travel exists and included within its dimensions is the right to establish residence in Connecticut. Denying to the plaintiff even a gratuitous benefit because of her exercise of her constitutional right effectively impedes the exercise of that right. See Sherbert v. Verner, 374 U.S. 398, 405–406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Because Conn.Gen.Stat. § 17–2d has a chilling effect on the right to travel, it is unconstitutional.

Not only does § 17–2d abridge the right to travel and its concomitant right to establish residence, but it also denies plaintiff the equal protection of the laws. "Judicial inquiry under the Equal Protection Clause * * * does not end with a showing of equal application among the members of the class defined by the legislation. The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose * * *." McLaughlin v. State of Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). Connecticut states quite frankly that the purpose of

§ 17–2d is to protect its fisc by discouraging entry of those who come needing relief.[3] The state has not shown that any significant number come for that purpose, and the evidence indicates that most of the class discriminated against come for other purposes, such as, hope of employment, to be with relatives in time of need, as in the case of plaintiff, or to resume residence in Connecticut after a period of absence. Even a classification denying aid to those whose sole or principal purpose in entry is to seek aid, however, would not be sustainable. Anyway, the classification made here, based not on purpose in coming but solely on indigency, hits most heavily those with not even an arguably bad purpose in coming and may not be upheld. As detailed above, the purpose of § 17–2d, to discourage entry by those who come needing relief, abridges the right to travel and to establish residence. A similar purpose was behind the statute invalidated in *Edwards*. California in *Edwards*, like Connecticut here, tried to justify its statute under the police power.

> Their coming here has alarmingly increased our taxes and the cost of welfare outlays, old age pensions, and the care of the criminal, the indigent sick, the blind and the insane.

> Should the States that have so long tolerated, and even fostered, the social conditions that have reduced these people to their state of poverty and wretchedness, be able to get rid of them by low relief and insignificant

welfare allowances and drive them into California to become our public charges, upon our immeasurably higher standard of social services? Naturally, when these people can live on relief in California better than they can by working in Mississippi, Arkansas, Texas or Oklahoma, they will continue to come to this State. 314 U.S. at 168, 62 S.Ct. 164, 86 L.Ed. 119.

Here, as there, the burden on the state treasury[4] does not justify an enactment with an invalid purpose.

The policy behind the equal protection clause has long been interpreted as that of preventing states from discriminating against particular classes of persons. E. g., Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Even if the purpose of § 17–2d were valid, which it is not, the classifications established by the statute and the regulations promulgated thereunder are not "reasonable in light of its purpose." Admittedly, the classifications are not drawn on the presumptively suspect lines of race, creed or color. Nor, at the time application for aid is made, can it be said that they are based on poverty; for, at that time, all bona fide applicants are indigent. Furthermore, no inquiry is made into the assets at any past point in time of those applicants who enter with a job or those who have one year's residence. But there is a classification based on wealth between those who enter with a cash stake and those like plaintiff who do not. This classification is in-

---

3. The legislative history further demonstrates that this is the purpose of § 17–2d. For example, Mr. Cohen, while recognizing that only a small proportion of new arrivals come to Connecticut to seek welfare, made the following argument in favor of § 17–2d:

   If we pass this Bill, the word could get around that we are not an easy state, and the rate of influx might relate more closely to the level of job opportunity. As responsible legislators we must, at some point, be interested in costs. I doubt that Connecticut can, or should continue, to allow unlimited migration into the State, on the basis of offering instant money and permanent income to all who can make their way to the

State, regardless of their ability to contribute to the economy.

Connecticut General Assembly 1965. House of Representatives Proceedings, Vol. II Part 7, pp. 194–195 (Connecticut State Library).

4. Incidentally, a small part of Connecticut's ADC budget is involved and the burden on the state treasury is not overwhelming. Connecticut estimates that the indigent who would come in should plaintiff prevail would cost another 2% in ADC, that is, some $2,000,000 annually. Approximately half of this sum, of course, would be paid by federal appropriation through Congressional recognition of the national nature of the problem.

valid because there is no showing that in the long run the applicant with the cash would be a lesser drain on the state treasury. Similarly, even though they are not based on wealth, the classifications of one year's residence or a job are not reasonable in light of the purpose of § 17–2d because again there is no showing that those applicants will be lesser burdens than applicants without jobs or one year's residence. Section 17–2d, in brief, violates the equal protection clause because even if its purpose were valid, which it is clearly not, the classifications are unreasonable.

▉ Granted, the state may provide assistance in a limited form with restrictions, so long as the restrictions are not arbitrary; but, in any case where the government confers advantages on some, it must justify its denial to others by reference to a constitutionally recognized reason. See Sherbert v. Verner, supra; Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). In Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), while striking down a Texas law which prevented servicemen from voting, the Court was careful to emphasize that, "Texas is free to take reasonable and adequate steps * * * to see that all applicants for the vote actually fulfill the requirement of bona fide residence." For example, if there were here a time limit applied equally to all, for the purpose of prevention of fraud, investigation of indigency or other reasonable administrative need, it would undoubtedly be valid. Connecticut's Commissioner of Welfare frankly testified that no residence requirement is needed for any of these purposes.

▉ Judgment may enter in favor of the plaintiff declaring the residence requirement of § 17–2d of the Connecticut General Statutes invalid as applied to plaintiff, awarding plaintiff monies unconstitutionally withheld,[5] and enjoining defendant from denying plaintiff Aid to Dependent Children solely because of her failure to meet the one-year residence requirement. Form of decree, including computation of amount of damages due, may be submitted by counsel for plaintiff on notice to counsel for defendant.

The above shall serve as the Findings of Fact and Conclusions of Law required by Fed.R.Civ.P. 52(a).

CLARIE, District Judge (dissenting):

I respectfully dissent and disagree with the majority opinion that § 17–2d of the Connecticut General Statutes is unconstitutional. The residence time qualification for welfare eligibility of non-residents coming into the State, as contained in the law, is a reasonable one directly related to the problem sought to be governed. It is a valid legislative classification, which the State has the discretion and authority to enact. It is not within the province of the judiciary to determine whether the remedy chosen is a wise one, but only whether it is constitutional. Railway Express Agency v. People of State of New York, 336 U.S. 106, 109, 69 S.Ct. 463, 93 L.Ed. 533 (1949); Daniel v. Family Sec. Life Ins. Co., 336 U.S. 220, 224–225, 69 S.Ct. 550, 93 L.Ed. 632 (1949); Olsen v. State of Nebraska, 313 U.S. 236, 246–247, 61 S.Ct. 862, 85 L.Ed. 1305 (1941).

Forty other states of the United States, including Connecticut, have established a one-year residence require-

---

5. That a state cannot be sued without its consent, Principality of Monaco v. State of Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934), is no barrier to awarding money damages here; for, in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court held that the Eleventh Amendment did not prevent a suit against a state official who was acting unconstitutionally. Conse-

quently, this court can order Commissioner Shapiro to tender monies which he unconstitutionally withheld. See, Department of Employment v. United States, 385 U.S. 355, 358, 87 S.Ct. 464, 17 L.Ed. 2d 414 (1966) where the Court ordered refund of taxes unconstitutionally paid. See also, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (unemployment benefits).

ment, as a condition of eligibility to qualify for aid to families with dependent children.[1] Congress itself has sanctioned the laws of these forty states, by enacting 42 U.S.C.A. § 602(b), which provides for a federal contribution to state administered programs, where the condition of eligibility does not exceed a one-year prior residence. As a practical matter, most states require a residence eligibility requirement or waiting period for all forms of welfare benefits.[2]

The majority opinion concedes that the purpose of § 17–2d is to protect the state's fiscal responsibilities by discouraging entry of those who come into the state seeking relief.[3] It goes even further and asserts that a classification denying aid to those whose sole or principal purpose in entering the state to seek aid would be unconstitutional. The principal basis for the majority position is that the law abridges the right of freedom to travel and to establish residence; and that because such a statute as § 17–2d has a chilling effect on the right to travel, it is therefore unconstitutional. The landmark case cited to support this position is Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

The latter case can be distinguished from the issue being litigated here. It involved a state statute, which made it a crime to transport across the state line into California, one who was an indigent. This statute was ruled unconstitutional by the United States Supreme Court, because it not only restricted commerce between the several states, but it also actually limited the right of citizens to travel freely between the several states. On the contrary, the statute which is now in issue, does not prohibit travel between the states as such. What it does do and is intended to do, is to deter those who would enter the state for the primary or sole purpose of receiving welfare relief allotments.

Connecticut is comparatively generous in welfare grants. The legislature provides an open-end budget in its biennial appropriations to the State Welfare Department,[4] so that no qualified applicant may be denied aid or caused personal hardship by delay or the arbitrary limitation of budgetary appropriations. Connecticut ranks fourth among all the states, with monthly payments of $197.00 (46% contributed by the federal government) for a family of four, compared with the national average of $148.00. An extreme comparison is had by comparing the average monthly payments for a similar family unit in Mississippi of $33.00; in Alabama, $48.00; in Florida, $60.00, and in South Carolina, $64.00. In these latter states, the federal government contributes 83%, the state 17%.[5] Thus by way of illustration and comparison, the State of Connecticut's monthly contribution is $109.00 compared with that of Mississippi's of $5.50. It should be noted that § 17–2d applies both to the general assistance allotments under § 17–273, Part I, Chapter 308, for which no federal contribution is provided, as well as to Chapter 301, aid to dependent children. Uncontrolled demands upon Connecticut's welfare program could effect an overall reduction of aid paid to eligible beneficiaries. It

---

1. (a) Stipulation of the Parties, Para. 61.
   (b) States which do not have any waiting period are Alaska, Georgia, Hawaii, Kentucky, Maine, North Dakota, South Dakota, New York, Rhode Island, and Vermont. Pocket Data Book USA, 1967, U. S. Dept. of Commerce, Statistical Reports Division, Lib. Cong. Card No. A66–7638.

2. Some thirty-five (35) states require that an applicant must have resided within the state five of the preceding nine years, including the immediate past year to be eligible to receive old age, deaf and blind benefits. Five (5) other states require simply a one-year residence to receive these benefits. See, Characteristics of State Public Assistance Plans Under the Social Security Act, U.S. Gov. Print. Off. (1965). Also see, 42 U.S.C.A. §§ 1202, 1352.

3. Supra, note 1(b) at 182.

4. Conn.Gen.Stat. (Rev.1958) § 4–95.

5. Stipulation of Parties, Paras. 58, 59.

is a proper function of the legislature to enact such reasonable statutory controls, under the police powers reserved to the state in the Federal Constitution,[6] that its obligations to aid the needy of the state may continue to be generously fulfilled. Missouri, Kansas & Texas Railway v. Haber, 169 U.S. 613, 629, 18 S.Ct. 488, 42 L.Ed. 878 (1898).

The United States Supreme Court recognized the problem when it upheld the constitutionality of the Federal Social Security Act:

"A system of old age pensions has special dangers of its own, if put in force in one state and rejected in another. The existence of such a system is a bait to the needy and dependent elsewhere, encouraging them to migrate and seek a haven of repose. * * *" Helvering v. Davis, 301 U.S. 619, 644, 57 S.Ct. 904, 81 L.Ed. 1307 (1937).

Connecticut has always freely exercised its sovereign right as a state, to legislate and administer controls governing a myriad of comparable state services. A needy student, to be eligible for a scholarship loan, must have resided within the state for the twelve (12) months previous to his application;[7] to receive aid to send a blind child for instructions, both the child and one of his parents or guardians must have resided within the state for one (1) year preceding the application.[8] To be an elector, one must have resided within the state for six months.[9] To be eligible to hold a liquor permit one must first be an elector.[10] With certain specified exceptions, a one year's residence is a prerequisite to applying for employment in the state merit system.[11] A plaintiff in a divorce action must have resided in the state continuously for three (3) years prior to bringing an action, unless the

cause arose subsequent to residence within the state.[12] The captains and members of the crew of oyster boats, in order to be licensed must have a one-year residence,[13] as well as those who would take scallops from state waters;[14] and so on ad infinitum.

Are these residence requirements established through several generations of orderly state growth, now to be struck down as constituting a constitutionally unlawful discrimination between the citizens who have just moved into the state and those who meet these reasonable statutory requisites? Such a decree by judicial fiat would go far toward completing the annihilation of the police powers, which were reserved to the several states and to the people under the tenth amendment to the Federal Constitution.

It is not within the province of this Court to pass upon the state legislature's wisdom in causing the enactment of this law, but whether or not the law violates the constitutionally guaranteed rights of its citizens. As Mr. Justice Frankfurter said in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 647, 63 S.Ct. 1178, 87 L.Ed. 1628 (1942):

"It can never be emphasized too much that one's own opinion about the wisdom or evil of a law should be excluded altogether when one is doing one's duty on the bench. The only opinion of our own even looking in that direction that is material is our opinion whether legislators could in reason have enacted such a law."

An historical review of the legislative act which preceded § 17-2d illuminates and discloses the true purpose of this law. § 1, Public Act No. 501, 1963 Connecticut General Assembly provided:

"When any person comes into this state without visible means of support

6. Art. X, Amendment to the Constitution of the United States.

7. Conn.Gen.Stat. (Rev.1958) § 10–116c.

8. Conn.Gen.Stat. (Rev.1958) § 10–295(b).

9. Conn.Gen.Stat. (Rev.1958) § 9–12.

10. Conn.Gen.Stat. (Rev.1958) § 30–45(3).

11. Conn.Gen.Stat. (Rev.1958) § 5–39.

12. Conn.Gen.Stat. (Rev.1958) § 46–15.

13. Conn.Gen.Stat. (Rev.1958) § 26–212.

14. Conn.Gen.Stat. (Rev.1958) § 26–288.

for the immediate future and applies for aid to dependent children under chapter 301 or general assistance under part I of chapter 308 of the general statutes within one month from his arrival, the welfare commissioner shall determine whether such person's remaining will serve the best interests of (a) the state, (b) the town to which the person has come and (c) such person. In making his determination, the commissioner shall consider (a) the circumstances involved in such person's coming to this state, (b) his situation now that he is here, (c) the circumstances involved if he remains, (d) whether he comes to this state able and willing to support himself or whether he came for the purpose of seeking welfare assistance and (e) whether he will need such assistance indefinitely."

The 1965 Session then amended the law, § 17–2d, so as to change the phrase "one month from his arrival" to "one year from his arrival"; it eliminated the statutory restrictive standards for the guidance of the Commissioner's administration of the act, and adopted the maximum federal residence requirement. 42 U.S.C.A. § 602(b). The intent of the law was to exclude those from benefits, who came into the state for the primary purpose of seeking welfare assistance and it should be so construed and interpreted. It has always been a principle of constitutional interpretation that the Courts, if at all possible, should construe a statute so as to bring it within the Constitution. Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162 (1924); United States v. Delaware & Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836 (1909).

The Public Welfare Committee of the 1967 Legislature, just adjourned, considered this residence issue in Substitute for Senate Bill No. 166; the bill was defeated by recommitment to committee.

The legislature so exercised its sovereign police power to classify equally all non-residents who came into Connecticut, who applied for welfare aid within a stated time period. The law affected all persons similarly situated in the class described:

"Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment." Barbier v. Connolly, 113 U.S. 27, 32, 5 S.Ct. 357, 360, 28 L.Ed. 923 (1885).

Without such a statutory deterrent, this state would be powerless to prevent its becoming a refuge for welfare recipients of other states; even those who might be encouraged or even assisted to migrate from their settlement of origin.

"Freedom of residence is restricted as to citizens only while on relief. * * * No interference is had with the right of any citizen to choose and establish a home. What is controlled is the unrestricted imposition of indigent persons and families without settlement upon a community and State where they cannot establish a home because of their indigent status. * * * Such conditions restrict individual rights and freedom in the interest of the right, security and freedom of the rest of the community of the State." Matter of Chirillo, 283 N.Y. 417, 28 N.E.2d 895 (dissenting opinion).

I further dissent from the award of money damages to the plaintiff by the majority for the past aid alleged to have been unconstitutionally withheld. Connecticut has not consented to be sued for money damages in this class of action. Principality of Monaco v. State of Mississippi, 292 U.S. 313, 324, 54 S.Ct. 745, 78 L.Ed. 1282 (1933); Ex parte State of New York No. 1, 256 U.S. 490, 497, 41 S.Ct. 588, 65 L.Ed. 1057 (1920).

Welfare aid, by its nature, does not create a vested right to back payments which have been denied. Public welfare is a current subsistence grant from public charity funds administered by statu-

tory standards. This is confirmed by the philosophy behind the state welfare laws requiring reimbursement from paupers for support payments. §§ 17–277, 17–298. This plaintiff has been living on monthly allotments from a private source, the Catholic Family Services of Hartford. A money judgment award, under the circumstances, would amount to a gratuitous windfall.

Without such a right to reimbursement for past allotments, the case is now moot. The plaintiff moved to Hartford, Connecticut, in mid-June 1966. Her present residence eligibility under § 17–2d, having been satisfied, she now qualifies to apply for aid to dependent children under Chapter 301. The case should accordingly be dismissed. Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).