Minnie **HARRELL** et al., Plaintiffs,
Clay Mae LeGrant, Plaintiff-Intervenor,

v.

Walter N. **TOBRINER** et al., Defendants.

Vera M. **BARLEY** et al., Plaintiffs,

v.

Walter N. **TOBRINER** et al., Defendants.

Gloria Jean **BROWN** et al., Plaintiffs,
Clay Mae LeGrant, Plaintiff-Intervenor,

v.

Walter N. **TOBRINER** et al., Defendants.

Civ. A. Nos. 1497–67, 1579–67,
and 1749–67.

United States District Court
District of Columbia.

Nov. 8, 1967.
Probable Jurisdiction Noted
March 4, 1968.
See 88 S.Ct. 1053.

David H. Marlin, Washington, D. C., and Laurens H. Silver, Washington, D. C., for plaintiffs.

Charles T. Duncan, Corp. Counsel, and John A. Earnest and John H. Suda, Asst. Corp. Counsel, for defendants.

Before BAZELON, Chief Circuit Judge, FAHY, Senior Circuit Judge, and HOLTZOFF, District Judge.

## OPINION

FAHY, Circuit Judge.

Plaintiffs and intervenor,[1] all now to be referred to as plaintiffs, in slightly differing factual situations applied for public assistance under the District of Columbia Public Assistance Act of 1962, Title 3, Chapter 2, D.C.Code (1967). Defendants, who have official responsibility in the matter, denied the applications. The sole ground of denial was that plaintiffs and the minor children on whose behalf they sought aid had not complied with the residence requirements of D.C.Code § 3–203(a) (b) (1967), set forth in the margin insofar as pertinent to this case,[2] and with the regulations promulgated pursuant to the statute. Plaintiffs seek relief by declaratory judgments and injunctions against enforcement by defendants of such residence requirements.[3] The complaints proceed on two theories, first, that Section 3–203 vests a discretion in the defendants to disregard the one-year residence requirements and they have not exercised such discretion, and, second,

1. See note 3 infra.

2. § 3–203. Eligibility for public assistance.

Public assistance shall be awarded to or on behalf of any needy individual who either (a) has resided in the District for one year immediately preceding the date of filing his application for such assistance; or (b) who was born within one year immediately preceding the application for such aid, if the parent or other relative with whom the child is living has resided in the District for one year immediately preceding the birth; or (c) is otherwise within one of the categories of public assistance established by this chapter: * * *

3. In the case of plaintiff Minnie Harrell and her co-plaintiffs neither she nor they had resided in the District a year when she applied. In the case of Gloria Jean Brown, et al., who sues on behalf of three children, the children had not resided a year here when application for them was made. In the case of Vera M. Barley the denial of her application was on the ground that her residence at St. Elizabeths Hospital for a period which otherwise was more than adequate could not be considered because under the regulations residence could not be "gained" while one was confined to a public institution. She has been deemed competent since September 15, 1965, but is without financial resources sufficient to obtain care in a foster home, which prevents

that if there is no such discretion the one-year residence requirements of Section 3–203 are constitutionally invalid.

This three-judge District Court was convened pursuant to 28 U.S.C. § 2282[4] and was composed under the provisions of 28 U.S.C. § 2284.

On September 11, 1967, after argument, we granted the motion of plaintiffs for a preliminary injunction pendente lite or until the further order of the court.[5] We accompanied our order with Findings of Fact and Conclusions of Law, the findings setting forth in detail the factual situation of each plaintiff, which still prevails in essential respects. The matter is decided now on motions for summary judgment submitted by both plaintiffs and defendants, enabling us to decide the merits, there being no genuine issues of material fact requiring an evidentiary hearing.

## I

■ We agree with defendants that Section 3–203 does not grant defendants a discretion to disregard the one-year residence requirements applicable to plaintiffs. This construction is supported not only by the language of the statute but also by its legislative history. The Senate District of Columbia Committee in its Report on the Act stated that one of the congressional purposes was to

(c) Make uniform in all categories a 1-year residence requirement for public assistance eligibility. (S. Rep. No. 844, 87th Cong., 1st Sess. (1961).)

■ The administrators of the program have consistently interpreted the statute as the legislative history thus indicates Congress intended, that is, that the language "public assistance shall be awarded" to those who meet the one-year conditions means that the assistance is not to be granted unless those conditions are met. This consistent and reasonable interpretation by those charged with the duty of administering the statute is entitled to great weight. Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179; Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616; United States v. American Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345. Moreover, we independently interpret the language used by Congress in like manner. It becomes our duty therefore to decide the validity of the challenged parts of the statute as so construed.[6]

---

her, without public assistance, leaving St. Elizabeths. In the case of intervenor Clay Mae LeGrant neither she nor her children had resided here a year when applications for them were made.

4. 28 U.S.C. § 2282:
   An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

5. The order in its operative part reads:
   That the defendants, Walter N. Tobriner, individually and as President of the Board of Commissioners of the District of Columbia; John B. Duncan and Robert E. Mathe, individually and as members of the Board of Commissioners of the District of Columbia; Winifred G. Thompson, individually and as Director of the Department of Pub-

lic Welfare of the District of Columbia; Donald Gray, individually and as Chief of the Public Assistance Division, Department of Public Welfare of the District of Columbia; and Vivian Jodon, Chief of Intake, Public Assistance Division, Department of Public Welfare of the District of Columbia, be, and hereby are, enjoined, pendente lite or until further order of the court, from denying public assistance to plaintiffs by reason of any of the one-year residence requirements of Title 3, Section 203, of the District of Columbia Code (1967) and regulations thereunder. [District Judge Holtzoff's dissent was noted on the order.]

6. None of the parties questions the application of Section 2282 on the ground that the Code provision is not an "Act of Congress" within the meaning of Section 2282. In this connection see Hobson v. Hanson, D.C., 265 F.Supp. 902. Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435, is not to the con-

■ A court approaches its responsibility of passing upon the constitutional validity of an Act of Congress aware that Congress also interprets the Constitution. This is so even though Congress' judgment is manifested, as in the present case, merely by passage of the legislation rather than by explicit treatment of the constitutional question. Moreover, as Mr. Justice Goldberg stated for the Court in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 159, 83 S.Ct. 554, 562, 9 L.Ed.2d 644:

> Since the validity of an Act of Congress is involved, we begin our analysis mindful that the function we are now discharging is "the gravest and most delicate duty that this Court is called upon to perform." Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (separate opinion of Holmes, J.). This responsibility we here fulfill with all respect for the powers of Congress, but with recognition of the transcendent status of our Constitution.

In Trop v. Dulles, 356 U.S. 86, 103–104, 78 S.Ct. 590, 599–600, 2 L.Ed.2d 630, Mr. Chief Justice Warren has stated the matter as it must be considered:

> The provisions of the Constitution are not time-worn adages or hollow shibboleths. They are vital, living principles that authorize and limit governmental powers in our Nation. They are the rules of government. When the constitutionality of an Act of Congress is challenged in this Court, we must apply those rules. If we do not, the words of the Constitution become little more than good advice.
>
> When it appears that an Act of Congress conflicts with one of these provisions, we have no choice but to enforce the paramount command of the Constitution. We are sworn to do no less. * * * We do well to approach this task cautiously, as all our predecessors have counseled. But the ordeal of judgment cannot be shirked.

■ In line with the caution thus admonished, applicable to us certainly no less than to the Supreme Court, we should construe the challenged portions of Section 3–203 so as to avoid a serious constitutional question if reasonably able to do so. United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770. But it seems clear to us that Congress intended to impose one-year residence requirements as conditions, similar to conditions prevailing in numerous other jurisdictions. There is no evidence of a congressional intent to depart from a rather widespread legislative pattern in this area. This pattern lends support to defendants' interpretation of Section 3–203 as precluding a discretion on their part to disregard the requirements. Our agreement with defendants' interpretation requires us to reach the constitutional question.

■ Any weight the legislative pattern gives to defendants' constitutional position, however, as distinguished from their statutory interpretation, we think is overcome by considerations which stem primarily from the equal protection of the laws guaranteed by the Fourteenth Amendment and applicable to this jurisdiction by reason of the Due Process Clause of the Fifth Amendment.[7]

Notwithstanding the frequent use of such a residence condition, only recently has it come before federal courts for decision as to its validity. Nine federal

---

trary, for there the issue of constitutional validity of the statute arose and was decided under judicial review procedures established by the statute under which the determination arose, not by direct suit such as we have to enjoin the operation of a statute and regulations thereunder. In this connection we bear in mind also the three-judge District Court requirements of 28 U.S.C. § 2281, applicable to the challenge of state-wide legislation. The District of Columbia, though not a state, is comparable to a state in considering this problem.

7. Denial of equal protection offends the Due Process Clause of the Fifth Amendment, applicable to this jurisdiction, as well as the Equal Protection Clause of the Fourteenth, applicable in terms to the States. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884; Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218.

judges, in three separate cases, with one judge dissenting, have recently considered the constitutional questions involved. Thompson v. Shapiro, 270 F. Supp. 331 (a three-judge District Court of the District of Connecticut); Green v. Department of Public Welfare, 270 F. Supp. 173 (a three-judge District Court of the District of Delaware); and Smith v. Reynolds, 277 F.Supp. 65 (a three-judge District Court of the Eastern District of Pennsylvania). In *Thompson* and *Green* the residence requirements, respectively, of Connecticut and Delaware, were held unconstitutional. In Smith v. Reynolds a final decision has not been reached, but enforcement of such a requirement in Pennsylvania has been enjoined preliminarily on constitutional grounds.

In *Thompson* the court first concluded the provision constituted an arbitrary classification in violation of the Fourteenth Amendment's prohibition against state abridgment of the privilege and immunity of a citizen of the United States to enjoy the liberty to travel interstate. The court relied heavily upon Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119. The court also relied upon a more general liberty of the citizen to travel, upheld by the Supreme Court in the passport cases, including Kent v. Dulles, 357 U.S. 116, 126–127, 78 S.Ct. 1113, 2 L.Ed.2d 1204, and United States v. Guest, 383 U.S. 745, 759, 86 S.Ct. 1170, 16 L.Ed.2d 239. The *Thompson* court said:

> the right to travel exists and included within its dimensions is the right to establish residence in Connecticut. Denying to the plaintiff even a gratuitous benefit because of her exercise of her constitutional right effectively impedes the exercise of that right.

270 F.Supp. at 336.

Second, the court in *Thompson* decided that the Equal Protection Clause of the Fourteenth Amendment was violated:

> * * * the classifications of one year's residence or a job are not reasonable in light of the purpose of § 17–2d because again there is no showing

that those applicants will be lesser burdens than applicants without jobs or one year's residence. Section 17–2d, in brief, violates the equal protection clause because even if its purpose were valid, [to protect the finances of the states] which it is clearly not, the classifications are unreasonable.

Id. at 338.

In *Green* the court, in holding invalid the Delaware one-year requirement for public assistance, said that the test under the Equal Protection Clause was whether the classification based on residence was reasonably related to the purpose of the statute, citing Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485. The court then pointed out that the purpose of the public assistance program was " 'to promote the welfare and happiness of all people of the State, by providing public assistance to all of its needy and distressed; that assistance shall be administered promptly and humanely with due regard for the preservation of family life * * *.' " 270 F.Supp. at 177.

With these purposes in mind the court considered the reasonableness of the one-year residence provision in relation to those purposes, holding,

> It is evident to us that as to these families living in Delaware for less than one year the denial of public assistance fails to carry out the stated purposes for the Public Assistance Code. It in fact tends to frustrate them. The residency requirement prevents prompt assistance to some of the State's needy and distressed and to that extent is the antithesis of "humane." It also necessarily results in pressure on the solidarity of the family unit. Nor given these circumstances is it an acceptable answer to say that until they are here one year such persons are not a part of the state's needy and distressed. The discrimination based on length of residency thus finds no constitutional justification in the purpose declared in the statute itself.

We have given first consideration to the above three-judge District Court cases because they are recent decisions on

precisely the same subject and are not decisions of more remote application. We must be certain, however, that they comport with principles established by the Supreme Court. Although the Court has not dealt with this particular situation its decisions in other areas reveal the applicable principles, and to them we now turn.

In McLaughlin v. State of Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 287, 13 L.Ed. 2d 222, our task in interpreting the Equal Protection Clause is stated as follows:

The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose * * *.

Carrington v. Rash, 380 U.S. 89, 93, 85 S.Ct. 775, 13 L.Ed.2d 675, restated this test in exactly the same language.

In Bates v. City of Little Rock, 361 U.S. 516, 525, 80 S.Ct. 412, 417, 4 L.Ed. 2d 480, a case involving First Amendment rights of association, the Court declared that,

When it is shown that state action threatens significantly to impinge upon constitutionally protected freedom it becomes the duty of this Court to determine whether the action bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification.

In Gulf, Colorado & Santa Fe Ry. v. Ellis, 165 U.S. 150, 155, 17 S.Ct. 255, 257, 41 L.Ed. 666 (1897), the power of classification was recognized as permitted by the Fourteenth Amendment, but the Court added that: "it is equally true that such classification cannot be made arbitrarily."

More specifically, in Truax v. Raich, 239 U.S. 33, 42, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915), the Court stated that "reasonable classification implies action consistent with the legitimate interests of the State, * * * *"

A principal purpose of Section 3–203 obviously is to provide public assistance to the needy. Moreover, the immediately preceding section provides that the entire public assistance chapter shall be administered so as to provide the maximum cooperation with other agencies rendering services in order "to maintain and strengthen family life and to help applicants for public assistance and recipients to attain self-support or self-care." D.C. Code § 3–202(b)(1) (1967). These purposes constitute the keystone of the legislation. A bona fide resident of the District of Columbia for six months who is indigent and without the means by which to support herself and her children is no less in need of public assistance than an indigent who has been here for a full year. The basic purposes of the legislation—public assistance to those in need, maintenance and strengthening of family life, achievement of self-support and self-care—are not more faithfully served by withholding aid until applicants have lived here for twelve months. Indeed, the denial of assistance for an entire year to otherwise qualified recipients may only erode values which the statute tries to promote. The spread over a year's time of the evils which public assistance seeks to combat may mean that aid, when it becomes available, will be too late: Too late to prevent the separation of a family into foster homes or Junior Villages; too late to heal sickness due to malnutrition or exposure; too late to help a boy from succumbing to crime.[8]

■■■ Section 3–203 creates two classes of persons: those who have resided in the District of Columbia for one year or longer, and those who have resided here

---

8. Recent studies have confirmed:
    Burglary, robbery, and serious assaults occur in areas characterized by low income, physical deterioration, dependency, racial and ethnic concentrations, broken homes, working mothers, low levels of education and vocational skill, high unemployment, high proportions of single males, overcrowded and sub-

standard housing, high rates of tuberculosis and infant mortality, low rates of home ownership or single family dwellings, mixed land use, and high population density. President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 35 (1967).

for less than one year. Although the Supreme Court has recognized that a "legislature is free to make classifications in the application of a statute which are relevant to the legislative purpose," it has emphasized that the "ultimate test of validity is not whether the classes differ but whether the differences between them are pertinent to the subject with respect to which the classification is made." Asbury Hospital v. Cass County, 326 U.S. 207, 214, 66 S.Ct. 61, 65, 90 L.Ed. 6. If a six-month resident is denied the assistance given to a one-year resident, in circumstances in which each is otherwise within the requirements of the statute, the former is denied the equal protection of the law, for the clearly different treatment has no reasonable relation to the basic legislative purposes. The disqualifying requirement applicable to plaintiffs thus engrafts upon the legislation an invalid provision. The same reasons which led the courts in the *Thompson* and *Green* cases, and pendente lite in the *Smith* case, to hold comparable provisions invalid as classifications without a reasonable relation to the purposes of the legislation apply to our cases.

### III

We consider now arguments which have been urged in support of the residence requirement.

█ It is said that Congress in gratuitously providing for assistance may not be held to constitutional standards. The decisions are to the contrary. In Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965, the Supreme Court held that the fact that "unemployment compensation benefits are not appellant's 'right' but merely a 'privilege' " does not save a statute limiting such rights from "constitutional infirmity." [9] There is no indication in our cases that Congress desired unequal protection of the laws. Congress viewed the eligibility provision as justified. Our judicial problem is to determine the reasonableness of

the difference in treatment which the challenged requirement imposes upon those in need of public assistance. There is no escape from the proposition that, in carrying forward a comprehensive program of this character, restrictions having no reasonable relationship to the basic purposes of the program are not immune from attack because the Congress was not under legal obligation to inaugurate the program. The *Thompson, Green,* and *Smith* cases, to which we have referred in other respects, support this position.

█ Defendants also contend that the restriction is reasonable because it is designed to protect this jurisdiction from an influx of persons seeking more generous public assistance than might be available elsewhere. Congress made no finding to that effect. As we have seen,[10] the reason for the one-year residence requirement given in the Report of the Senate Committee was uniformity. Assuming, however, that Congress had in mind the protective purpose advanced by defendants, we are reminded that the historical origin of the localized character of public assistance was the Elizabethan Poor Laws.[11] These laws enshrined the notion of "settlement," from which the concept of residence descended. Only those who were settled there were entitled to receive relief from a community. No doubt due in large part to the influence of these English laws—perhaps a subconscious influence—a number of our state legislatures adopted the idea of a minimum period of residence as a prerequisite to eligibility. But the Supreme Court pointed out more than twenty-five years ago that

the theory of the Elizabethan poor laws no longer fits the facts. Recent years, and particularly the past decade, have been marked by a growing recognition that in an industrial society the task of providing assistance to the needy has ceased to be local in character.

---

9. See also Note, 73 Harv.L.Rev. 1595, 1599–1602 (1960).

10. Supra, p. 24.

11. The Poor Relief Act, 1601, 43 Eliz. 1, c. 2; The Poor Relief Act, 1662, 13 & 14 Car. 2, c. 12.

Edwards v. People of State of California, 314 U.S. 160, 174–175, 62 S.Ct. 164, 167, 86 L.Ed. 119.

Another difficulty in accepting the protective assumption as giving constitutional support to the challenged provision, is the speculative character of the assumption from a factual standpoint. In 1956, the Deputy Commissioner of Social Welfare of the State of New York, which has not had a minimum period of residence for nearly a century stated that in the preceding year only two per cent of all public assistance recipients had lived in New York for less than one year.[12] In 1963, the Moreland Commission on Public Welfare in New York, after a lengthy study of the entire fabric of public assistance, stated that it was opposed to residence requirements on the ground that "the present laws [designed to prevent abuse] are sufficient to protect the taxpayer without penalizing the unfortunate." [13] "To assume that people are influenced to move or not to move according to the availability of help on a relief basis is to misunderstand the dynamics of human behavior." [14] This is especially true in the United States. A committee of Congress has stated that "[g]eographical mobility has always been a habit of the American people." [15]

■■■ Even if some citizens do enter a state in order to obtain greater welfare aid, the possibility of this effect, alone, is not in the circumstances sufficient to require the court to sustain the residence condition. As against a similar contention in the *Green* case, the court interposed the decision of the Supreme Court in Edwards v. People of State of California, supra, saying that

such a ground was "a constitutionally impermissible basis for separate state treatment." The court continued:

> The protection of the public purse, no matter how worthy in the abstract, is not a permissible basis for differentiating between persons who otherwise possess the same status in their relationship to the State of Delaware.

Assuming that a provision to prevent abuse of the public assistance program would be valid—a case of abuse is not before us—the challenged provision sweeps before it all who have less than the required residence, including bona fide residents who had come to this jurisdiction for reasons disassociated entirely from a desire to obtain relief. This is too broad to be sustained in light of the resulting inequality of treatment:

> [A]ssuming, for the purpose of argument only, that the basic prohibition is constitutional, it does not follow that there is no constitutional limit to the means which may be used to enforce it.

Oyama v. State of California, 332 U.S. 633, 646–647, 68 S.Ct. 269, 275, 92 L.Ed. 249; and see concurring opinion of Mr. Justice Brennan in Trop v. Dulles, 356 U.S. at 114, 78 S.Ct. at 605, where he discussed the need of legislation to achieve desired ends by alternative methods open to less objection.

In *Thompson*, in language particularly applicable to our case, it is said:

> [I]f there were here a time limit applied equally to all, for the purpose of prevention of fraud, investigation of indigency or other reasonable administrative need, it would undoubtedly be valid. Connecticut's Commissioner of

---

12. Kasius, What Happens in a State Without Residence Requirements, in Residence Laws: Road Block to Human Welfare 19–20 (1956).

13. State of New York, Moreland Commission on Welfare, Public Welfare in the State of New York 27–28 (1963). See also Hyde, The Trouble with Residence Laws, 16 Public Welfare 103, 105 (1958).

14. Kasius, note 12 supra, at 20. See also Moreland Commission Report, supra note

13, at 28: " * * * welfare aid is not a lure for people on the move, and * * * migration to states where living is attractive is high *despite* strict residence requirements." (Emphasis in original.)

15. House Select Comm. Investigating National Defense Migration, Analysis of Material Bearing on the Economic Social Aspects of the Case of Edwards v. People of State of California, 77th Cong., 1st Sess. 2 (1941).

Welfare frankly testified that no residence requirement is needed for any of these purposes.

270 F.Supp. at 338.[16] And see *Green,* where the desire to avoid payments tainted with fraud or based on insufficient information, which the court said were of course legitimate ends, did not justify the one-year residence requirement, "particularly in view of the consequences to persons in need, * * *" 270 F.Supp. at 177. Whether or not a narrower provision designed to prevent abuse would be valid would of course depend upon its terms.[17]

■ The choice of twelve months denies plaintiffs the equal protection of the laws because, in a manner inconsistent with the basic purpose of the legislation, it bars them from assistance granted to others. That basic purpose, simply stated, is to aid members of the community who are in need. That the residence requirement serves other purposes—ease of administration, or discouragement of movement to the jurisdiction—does not help defendants when the consequence is to defeat the primary purpose of the legislation. Other means to accomplish secondary purposes must be sought. This is especially true when the discrimination perpetuates the conditions the legislation is designed to cure.[18]

It is also said by defendants that Congress in 42 U.S.C. § 602(b), where the basis for the federal contribution to state public assistance programs is set forth,

has approved the one-year residence requirements of states. The fact is that Section 602(b) merely provides, in this connection, that the Secretary of Health, Education and Welfare shall not approve any plan which denies aid on the basis of an eligibility requirement of more than a year.

As to the possibility that the legislature intended to confine assistance to domiciliaries of the jurisdiction and that the one-year residence provides an objective legislative test of such status, the *Green* court held:

the one year residency requirement prevents many applicants from obtaining assistance even though they are clearly living in Delaware with an intention to remain indefinitely; * *

The court left open the question "whether a state could constitutionally confine the benefits of its public assistance programs to its own domiciliaries." We also are not called upon to decide this question, for it is not disputed that the plaintiffs are bona fide domiciliaries of the District who came for reasons disassociated from the desire to obtain relief not elsewhere available.[19]

■ Finally, it is suggested that if the one-year residence provision is invalidated the whole program falls with it. We hold otherwise. No such result was held to follow in the *Thompson, Green* and *Smith* cases. It would not be reasonable to impute such an intention to Congress. Moreover, Section 203 is part of Chapter 2 of Title 3 of the Code,

---

16. Clearly administrative convenience is not in and of itself adequate support for infringement of a constitutional right. Harman v. Forssenius, 380 U.S. 528, 542, 85 S.Ct. 1177, 14 L.Ed.2d 50; Schneider v. Rusk, 377 U.S. 163, 167, 84 S.Ct. 1187, 12 L.Ed.2d 218.

17. The reliance of defendants in this connection upon People ex rel. Heydenreich v. Lyons, 374 Ill. 557, 30 N.E.2d 46, 132 A.L.R. 511 (1940), does not take into account the necessity of avoiding constitutional infringement by channeling the legislation so as to meet more directly the abuse sought to be avoided. Moreover, with great respect for the Illinois court, the more recent decisions of the

federal courts to which we have referred are more in harmony with our views in this matter.

18. See Moreland Commission Report, supra note 13, at 28: "Administratively, * * * the cost of investigating cases and enforcing residence laws costs more money than is saved."

19. The regulation under which plaintiff Vera M. Barley was denied assistance, based on her residing in a public institution, falls with the reasoning of our decision applicable to the other plaintiffs, especially in light of the factual situation of plaintiff Barley as outlined in footnote 3, supra.

and Section 223 of the chapter conclusively demonstrates Congress entertained no such intention. Section 223 is explicit:

If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby.

Views which support the validity of the one-year condition are well advanced by our dissenting brother, and by Judge Clarie, dissenting in *Thompson.* We readily acknowledge there is no absolute certainty about the reach of the Equal Protection Clause in this area of the law. "But the ordeal of judgment cannot be shirked." Trop v. Dulles, supra, 356 U.S. at 104, 78 S.Ct. at 600. We are encouraged to make the judgment we do not only by the decisions in *Thompson, Green* and *Smith,* but by the over-all salutary action of Congress in entering into the welfare programs of which Section 3–203 is a part. This national movement toward assistance where assistance is needed, and the human terms of the problem, permit the court somewhat greater latitude in deciding that this difference in the treatment of those in our midst who are in need amounts to unequal protection of the laws than if the treatment were with respect to some matter less critical to their living conditions.

An appropriate judgment will be entered based on our ruling that the one-year residence requirements of Section 3–203(a) (b) of our Code are invalid in application to plaintiffs and those in like circumstances. Counsel for the parties are requested to seek agreement on the form of judgment, taking into consideration any changes in the parties who are defendants due to reorganization of the Government of the District of Columbia.

BAZELON, Chief Judge (concurring).

I concur in Judge FAHY'S opinion and would only emphasize that equal protection requires a statutory classification to be reasonably related to a "proper governmental objective," Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), and that to deter indigents from settling in the District of Columbia is not such an objective, Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

HOLTZOFF, District Judge (dissenting).

I respectfully dissent from the conclusion of the majority that the District of Columbia statute prescribing a residence requirement of one year for eligibility for receiving public assistance is unconstitutional, as transgressing the Equal Protection of the Laws Clause of the Fourteenth Amendment, and as interfering with freedom of travel. In my opinion the enactment is a valid exercise of legislative power.

Each of the three consolidated actions now before the Court was instituted by an applicant for public assistance from the District of Columbia, whose request was denied by the local Welfare authorities, on the ground that she was ineligible because she had not been a resident of the District of Columbia for at least one year. In each instance, the plaintiff seeks a judgment setting aside the adverse action of the local Public Welfare authorities; requiring them to pass on the application for relief without regard to the residence requirement; and declaring the statutory provision imposing the residence requirement to be unconstitutional.

The District of Columbia statute involved in these cases is D.C.Code § 3–203, the pertinent provisions of which read as follows:

§ 3–203. *Eligibility for public assistance.*

"Public assistance shall be awarded to or on behalf of any needy individual who either (a) has *resided in the District for one year immediately preceding the date of filing his application for such assistance;* or (b) who was born within one year immediately preceding the application for such aid, if the parent or other relative with whom

the child is living has resided in the District for one year immediately preceding the birth; or (c) is otherwise within one of the categories of public assistance established by this chapter: * * * " [Emphasis supplied.]

The constitutionality of clauses (a) and (b) of the above statute is attacked in these actions.

In two of these cases the plaintiff is a mother with dependent children. The funds out of which public assistance for dependent children is disbursed by the States (including the District of Columbia) are in part provided by the individual States and in part by a grant from the Federal Government, authorized by the Social Security Act, Subchapter IV, entitled, "Grants to States for Aid and Services to Needy Families with Children", 42 U.S.C. § 601 et seq. In order to be eligible for a Federal grant for this purpose, a State is required to submit a plan to the Secretary of Health, Education and Welfare, containing certain specified provisions, 42 U.S.C. § 602(a). Subsection (b) of that section contains the following requirement:

"(b) The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) of this section, except that he shall not approve any plan which imposes as a condition of eligibility for aid to families with dependent children, a residence requirement which denied aid with respect to any child residing in the State (1) who has resided in the State for one year immediately preceding the application for such aid, or (2) who was born within one year immediately preceding the application, if the parent or other relative with whom the child is living has resided in the State for one year immediately preceding the birth."

In other words, the Social Security Act expressly authorizes States receiving Federal grants for aid to dependent children, to impose residence requirements for eligibility for relief, with the limitation that such residence requirements shall not exceed one year. Conse-

quently, insofar as aid to dependent children is concerned, the residence requirement exacted by the District of Columbia was expressly authorized by the Social Security Act, under which Federal grants are made to the States for that purpose. While the complaints in these actions do not expressly attack the validity of this provision of the Social Security Act, nevertheless, by necessary implication, a ruling that the District of Columbia statute is unconstitutional must also strike down in its wake the provision of the Social Security Act authorizing the enactment of such local requirements.

Statutes imposing specific residence prerequisites for receiving relief have been in existence in many States for a long time. They are not restricted to aid to dependent children, but in a broad scope are generally applicable to relief payment of all kinds. The usual residence requirement is one year. Without any attempt at making an exhaustive enumeration, a partial survey shows that the following States, among others, impose a residence requirement of at least one year as a qualification for receiving relief of any type: Maryland, West Virginia, North Carolina, South Carolina, Ohio, Illinois, Michigan, Wisconsin, Nebraska, Kansas, Texas, Colorado, Utah and Oregon. Virginia imposes such a condition for several types of relief. Such provisions are accepted as appropriate and prudent, if not indispensable, features of any system of administering relief to needy persons. The obvious purpose of such restrictions is to minimize the likelihood of imposition and abuses, even though at times they result in hardship to some individuals. The wisdom, policy, desirability, and expediency of such conditions are not within the purview of the judiciary, but must be determined by the legislature. The powers of Government are vested primarily in an elective Legislative body and an elective Executive. Were they to be shifted in whole or in part to the courts, composed of members holding office by permanent tenure, we would cease to have a popular form of govern-

ment. An oligarchy would supplant it, no matter how benevolent.

If the conclusion of the majority is sound, the necessary consequence would be 'that all such local statutes must be deemed invalid and that no specific residence requirement may be constitutionally imposed by the States as eligibility for welfare payments. The relief systems of most of the States would have to be revamped, transformed, and reorganized.

While the number and nature of statutes relating to welfare legislation that would be rendered invalid under the ruling of the majority need not deter the courts from declaring all of them unconstitutional, if in fact they clearly transgress some constitutional limitation, nevertheless, the number and extent of such statutes and the fact that they are an accepted feature of welfare legislation generally, should lead the court to pause. Doubts should be resolved in favor of validity, instead of upsetting all over the country well-established local plans for administering relief funds.

Members of the judiciary must not be influenced by their own views of the wisdom, expediency, or desirability of legislation, or by their own attitude toward charity. They must limit themselves to considering objectively and solely the constitutional power to enact the statute that is being challenged. As was said by Cardozo in *The Paradoxes of Legal Science,* "Legislature as well as court is an interpreter and a guardian of constitutional immunities." (p. 121).

While in determining justiciable cases and controversies brought before the Courts by persons having standing to sue, the courts in case of a conflict between an applicable statute and a pertinent constitutional provision, must have recourse to the Constitution as the supreme law of the land and ignore the statute, thereby adjudging the statute to be unconstitutional, the power to render such a decision must be exercised with caution, circumspection and delib-

eration. Statutes may not be lightly set aside by the judiciary on the theory that they contravene some constitutional limitation. It is a basic principle that there is a strong presumption of constitutionality as to every legislative enactment. This presumption must be clearly overcome before a statute may be declared invalid. The presumption of validity is not a mere form, but a potent rule that must be actively applied by the courts. Again, as was said by Cardozo,[1] "The presumption of validity should be more than a pious formula, to be sanctimoniously repeated at the opening of an opinion and forgotten at the end."

Chief Justice Marshall developed and expounded the doctrine that if in a justiciable controversy instituted by a party having standing to sue, it is determined that an applicable statute is in conflict with the Constitution the issues should be determined in accordance with the Constitution and the statute declared invalid, Marbury v. Madison, 1 Cranch. 137, 2 L.Ed. 60. He, nevertheless, called for caution in the exercise of this prerogative and announced that it should be exerted only if the conviction of incompatibility was clear and strong. He said in Fletcher v. Peck, 6 Cranch. 87, 128, 3 L.Ed. 162:

"The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

---

1. The Paradoxes of Legal Science, p. 125.

He reiterated this doctrine in Brown v. State of Maryland, 12 Wheat. 419, 436, 6 L.Ed. 678:

> "It has been truly said, that the presumption is in favor of every legislative act, and that the whole burden of proof lies on him who denies its constitutionality."

Chief Justice Waite summarized the same principle in the following manner, Sinking-Fund Cases, 99 U.S. 700, 718, 25 L.Ed. 496:

> "It is our duty, when required in the regular course of judicial proceedings, to declare an act of Congress void if not within the legislative power of the United States; but this declaration should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule."

Coming down to our own times, Mr. Justice Stone in Hardware Dealers' Mutual Fire Insurance Co. of Wisconsin v. Glidden Co. et al., 284 U.S. 151, 158, 52 S.Ct. 69, 71, 76 L.Ed. 214, emphasized that when legislation deals with a subject that is within the scope of legislative power, "the presumption of constitutionality is to be indulged."

In United States v. National Dairy Products, 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561, Mr. Justice Clark referred to the principle that a strong presumptive validity attaches to an Act of Congress.

Cases enunciating and applying this doctrine are legion. The following are a few of them: Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 625, 4 L.Ed. 629; Legal Tender Cases, 12 Wall. 457, 531, 20 L.Ed. 287; Munn v. State of Illinois, 94 U.S. 113, 123, 24

L.Ed. 77; United States v. Harris, 106 U.S. 629, 635, 1 S.Ct. 601, 27 L.Ed. 290; Close v. Glenwood Cemetery, 107 U.S. 466, 475, 2 S.Ct. 267, 27 L.Ed. 408; Atchison, Topeka & Santa Fe R. R. v. Matthews, 174 U.S. 96, 104, 19 S.Ct. 609, 43 L.Ed. 909; Middleton v. Texas Power & Light Co., 249 U.S. 152, 157, 39 S.Ct. 227, 63 L.Ed. 527; O'Gorman & Young, Inc. v. Hartford Fire Ins. Co., 282 U.S. 251, 257–258, 51 S.Ct. 130, 75 L.Ed. 324.

The principles that the Supreme Court formulated as a guide primarily for itself in deciding constitutional questions are *a fortiori* binding and controlling on District Courts and Courts of Appeals. From the early years of the Republic and through the first half of the Nineteenth Century, the Supreme Court consistently and rigidly adhered to these doctrines in passing upon the validity of legislative enactments. Thus, between 1790 and 1860 only two Acts of Congress were declared unconstitutional by the Supreme Court.[2] One of them, which was stricken down in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60, was a provision of the Judicial Code of minor importance relating to the jurisdiction of the Supreme Court.

A shift in the attitude toward the validity of legislative measures began after the Civil War and the subsequent enactment of the Fourteenth Amendment. From time to time legislation in the social and economic field was held invalid as repugnant to the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment. These provisions were deemed to enact into the Constitution the right of freedom of contract and the privilege of using one's property without governmental interference. During the decade beginning in 1920, the number of Acts of Congress declared invalid rose to a high point.[3] Almost invariably these decisions were reached against emphatic protests contained in dissenting opinions of members of the Court who were in the minority, but who have been regarded as en-

2. Robert H. Jackson, The Struggle for Judicial Supremacy, p. 40.

3. Robert H. Jackson, Id. p. 40.

lightened, progressive and far-sighted. Their dissenting opinions form part of the classics of our constitutional history and constitutional law.

In Lochner v. State of New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, in which a statute regulating the hours of labor in a bakery was held invalid as interfering with the freedom of contract, Mr. Justice Holmes wrote a forceful dissenting opinion, which has been often quoted and which is worthy of repetition. He said (p. 75, 25 S.Ct. p. 546):

> "This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of the majority to embody their opinions in law. It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious, or if you like as tyrannical, as this, and which, equally with this interfere with the liberty to contract. * * * *The 14th Amendment does not enact Mr. Herbert Spencer's Social Statics."* [Emphasis supplied.]

Mr. Justice Holmes again spoke out emphatically in protest against the decision of the majority in Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, in which the Supreme Court invalidated an Act of Congress prohibiting transportation in interstate commerce of goods manufactured in a factory employing child labor. In his dissenting opinion, Mr. Justice Holmes said, in part (p. 280, 38 S.Ct. p. 534):

> "I had thought that the propriety of the exercise of a power admitted to exist in some cases was for the con-

sideration of Congress alone and that this Court always had disavowed the right to intrude its judgment upon questions of policy or morals. It is not for this Court to pronounce when prohibition is necessary to regulation if it ever may be necessary * * *."

During that era there were numerous expressions in dissenting opinions of a similar tenor culminating in the celebrated dissenting opinion of Mr. Justice Stone in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, in which the Court held the Agricultural Adjustment Act to be unconstitutional. His *ringing words deserve frequent reiteration.* He said, in part (pp. 78–79, 87, 56 S.Ct. pp. 325, 329):

> "The power of courts to declare a statute unconstitutional is subject to two guiding principles of decision which ought never to be absent from judicial consciousness. One is that *courts are concerned only with the power to enact statutes, not with their wisdom.* The other is that while unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is *our own sense of self-restraint."*

> \*      \*      \*      \*      \*      \*

> "Courts are not the only agency of government that must be assumed to have capacity to govern."* [Emphasis supplied.]

The minority in many of these cases intimated from time to time that the majority were unconsciously influenced by their own personal predilections in social and economic matters. The situation became of sufficient moment for two Presidents of the United States to register protests in different ways. President Theodore Roosevelt suggested one remedy, and President Franklin D. Roosevelt recommended another.[4] As a matter of coincidence at about the time

---

4. For interesting accounts by two active participants in the controversy involved in the proposals of President Franklin D. Roosevelt, see Robert H. Jackson, The Struggle for Judicial Supremacy, pp. 177 et seq.; and Burton K. Wheeler, Yankee from the West, pp. 319 et seq.

when the proposal of President Franklin Roosevelt was defeated in Congress, the Supreme Court seemed to reverse its attitude, going as far as overruling some of the prior decisions to which reference has been made, West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, in which Mr. Chief Justice Hughes wrote the prevailing opinion. A new era in American constitutional history arrived. The tendency of the Supreme Court to annul social welfare legislation, which had prevailed for several decades was drastically ended, and was supplanted by a more progressive trend. It is to be hoped that the pendulum will not swing back and inaugurate another cycle when it may be said that personal, social and economic predilections of judges unconsciously influence decisions on constitutionality of legislation,—even though the predilections may be different.

In my opinion the statutory provision challenged in these cases is clearly a valid exercise of legislative power. Relief and welfare payments by the Government are grants. They are not the payment of legal obligations. The legislative branch of the Government in providing grants has a right to select objects for which and the persons to whom they shall be made. That it chooses to make grants to members of one group does not mean that it is under an obligation to make similar grants to members of another group, even though the second group may be similar to the first and equally worthy. A fortiori the fact that Congress has authorized grants to be made to members of one group, does not empower the courts to extend them to members of the second group.

Even in connection with meeting legal and moral obligations, the Congress may make distinctions between objects and persons. For example, by the Federal Tort Claims Act the Congress waived the sovereign immunity of the United States to suit in tort. It excepted, however, certain specified torts. Surely, it would not be contended that the excep-

tions are invalid and that, therefore, the immunity should extend to torts in the excepted list. So, too, certain groups of persons, such as Government employees, have been held to be outside of the scope of the Federal Tort Claims Act. Surely, it cannot be contended that these exceptions are likewise invalid and that, therefore, by judicial construction Government employees are entitled to the benefits of the Federal Tort Claims Act.

No basis for invalidity is discernible in a limitation of grants or welfare and relief funds to residents of the State. In fact, the majority opinion so concedes. The legislature, however, is not compelled to leave the matter of determining whether a particular person is or is not a resident to administrative officials. Such a course would be administratively inefficient, ponderous and slow, as well as expensive. No reason is perceived why Congress may not provide a simple formula for distinguishing permanent residents of the State from other persons who happen to be sojourning in it at any one time. Residence for one year is such a test. There are numerous rights and privileges that are conferred on residents of a State but which are denied to other persons within its boundaries. An outstanding example is the residence requirement for voters, imposing a specified length of residence within the State. Certain occupations are at times limited to residents. Numerous examples may be cited.

A somewhat similar question arose in Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435. The Social Security Act contains a provision cutting off old age insurance benefits and disability insurance benefits from any person who has been deported from the United States on any one of specified grounds, 42 U.S.C. § 402(n) (1). The validity of this provision was challenged in that case. The Supreme Court upheld the constitutionality of this Section, even though it related to benefits of a contributory insurance scheme to which the insured had made periodic payment, instead of consisting of mere grants, as

is the case here. In discussing this question the Supreme Court wrote as follows (p. 611, 80 S.Ct. p. 1373):

"In judging the permissibility of the cut-off provision of [§ 402(n)] * * * from this standpoint, it is not within our authority to determine whether the Congressional judgment expressed in that section is sound or equitable, or whether it comports well or ill with the purposes of the Act. 'Whether wisdom or unwisdom resides in the scheme of benefits set forth in Title II, it is not for us to say. The answer to such inquiries must come from Congress, not the courts. Our concern here, as often, is with power not with wisdom.' * * * Particularly when we deal with a withholding of a non-contractual benefit under a social welfare program such as this, we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification."

As concerns the Equal Protection of the Laws Clause of the Fourteenth Amendment, it needs no citation of authorities to establish that reasonable classifications are not a violation of that constitutional provision. Admittedly, it is reasonable to differentiate between residents and non-residents for the purpose of making relief payments. The one-year requirement is a simple method of distinguishing between the two groups. The Legislature does not have to adopt a ponderous system of taking evidence as to each applicant to determine whether the applicant is a *bona fide* resident of the State. As heretofore stated, such a method of administration might well bog down the whole relief system in delays, expenses and frustration. Legislatures may have valid reasons for limiting relief payments to residents of the State for a specific minimum period. Whether we would approve the same course as a matter of policy and expediency is immaterial. The manifest purpose of the legislation is to prevent a particular State or District

from becoming a Mecca for migrants from other States where relief payments are smaller. This is a reasonable and legitimate purpose.

A survey of relief payments in some of the neighboring States, as compared with those made in the District of Columbia, clearly demonstrates the reason for the possible fear of the District of Columbia that it might be confronted with an invasion of prospective applicants for relief from other States, if it were not for the residence qualification. For example, during the fiscal year ending June 30, 1967, the average monthly grant of aid to dependent children in the District of Columbia for a family was $168.08; in Virginia, it was $123.59; in Maryland, it was $153.22; in West Virginia, only $98.14; in North Carolina, it was $24.24 per person. The average grant of old age assistance in the District of Columbia was $67.20, as compared with $60.29 in Maryland; $48.16 in West Virginia; and $58.06 in North Carolina. The average monthly grant of aid to disabled was $81.72 in the District of Columbia, as compared with $75.57 in Maryland; $77.82 in Virginia; $45.77 in West Virginia; and $64.36 in North Carolina.

The second infirmity found in the statute by the majority opinion is that the limitation interferes with freedom of travel. The right to travel throughout the realm is concededly one of the privileges and immunities of a citizen of the United States. Clearly the District of Columbia or any one of the States, would be without power to block the entrance of any person residing within the United States, or in any way directly to interfere with travel between the States. The existence of this right does not bar the Congress, however, from imposing a tax on railroad, airline or bus tickets and thereby making travel more costly. It does not constitute an invalid interference with the right of travel from State to State, or from any State to the District of Columbia, to impose residence requirements for voters, or for the pursuit of specified occupa-

tions. The same reasoning applies to residence requirements for eligibility to relief payments.

The decision in Edwards v. People of State of California, 314 U.S. 160, 174, 62 S.Ct. 164, 86 L.Ed. 119 is clearly distinguishable. The statute held invalid in that case made it a criminal offense to bring in or assist in bringing in to the State any indigent person who was not a resident of the State. This enactment created a direct interference with the right of travel. The opinion of the Supreme Court pointed out clearly that all that was being determined was the propriety of an attempt by a State to prohibit transportation of indigent non-residents and the question of relief to newcomers was not involved. At page 174, 62 S.Ct. at page 167 the Court stated:

" * * * we are not now called upon to determine anything other than the propriety of an attempt by a State to prohibit the transportation of indigent non-residents into its territory. The nature and extent of its obligation to afford relief to newcomers is not here involved."

There is another and very important aspect to the subject under discussion. If the exclusion of persons who have not resided in the jurisdiction for at least one year is stricken down, the entire relief plan falls. This is not a case where one provision of the statute is so disconnected from the balance that the rest can stand even if the one provision be held invalid. Here the residence requirement is part of the scheme enacted by the Congress. If it is held that the Congress may not provide for welfare payments of one kind or another without including persons who have sojourned in the jurisdiction for less than one year, it does not follow that if the exclusion is annulled payment may be made to those persons whom Congress has expressly excluded. If the Congress passes an Act making grants to members of Group A and the Court holds that Congress may not constitutionally do so without extending the benefits to mem-

bers of Group B, the result is that the entire scheme becomes invalid. The Courts may not accord the benefits of the Act to members of Group B by practically amending the statute. Congress may well say that if we cannot limit our grants to members of Group A, no grants shall be made at all if we must include members of Group B. In other words, the subject must go back to Congress, and the entire statute dealing with public assistance, D.C.Code § 3:201–223 must be deemed invalid.

Mr. Justice Brandeis in Dorchy v. State of Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 324, 68 L.Ed. 686, a case that has often been cited as authoritative, summarized the governing principle as follows:

"But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall."

The fact that the statute contains a severability clause is not decisive. It merely shifts the burden of proof from the plaintiff to the defendant on the question whether the balance of the statute can remain operative if one part is excised as invalid.

In Hill v. Wallace, 259 U.S. 44, 71, 42 S.Ct. 453, 459, 66 L.Ed. 822, the Court stated:

" * * * undoubtedly such a provision furnishes assurance to courts that they may properly sustain separate sections or provisions of a partly invalid act without hesitation or doubt as to whether they would have been adopted, even if the Legislature had been advised of the invalidity of part. *But it does not give the court power to amend the act.*" [Emphasis supplied.]

In this instance if the exclusion of persons who have not resided in the jurisdiction for at least one year, is stricken down with the intention that

this group should receive the benefit of the Act, the majority of the Court would be amending the Act and expanding its scope. The exclusion is part of the warp and woof of the statute and not a separable clause.

In Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330, 362, 55 S.Ct. 758, 767–768, 79 L.Ed. 1468, the Court discussed the effect of a severability clause as follows:

"Such a declaration provides a rule which may aid in determining the legislative intent, but is not an inexorable command. Dorchy v. Kansas, 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686. It has the effect of reversing the presumption which would otherwise be indulged, of an intent that unless the act operates as an entirety it shall be wholly ineffective. * * * But notwithstanding the presumption in favor of divisibility which arises from the legislative declaration, we cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole."

In Carter v. Carter Coal Co., 298 U.S. 238, 313, 56 S.Ct. 855, 874, 80 L.Ed. 1160, the Court succinctly summarized this doctrine and the effect of the severability clause as follows:

"The statutory aid to construction in no way alters the rule that in order to hold one part of a statute unconstitutional and uphold another part as separable, they must not be mutually dependent upon one another."

The conclusion is inescapable that if the Court strikes down the provision of the public assistance statute of the District of Columbia limiting the benefits of the Act to needy individuals who have resided in the District of Columbia for at least one year, the entire statute is nullified, because Congress did not legislate to make grants to anyone who does not meet the eligibility requirement, and if this qualification is annulled, the entire Act falls. The Court may not by construction extend the provisions of the Act to persons not included in it. The only remedy would be new legislation.

I am not unmindful of the fact that a similar residence requirement in Delaware has been recently held unconstitutional by a three-judge District Court, Green v. Department of Public Welfare, 270 F.Supp. 173; and likewise that a Connecticut statute that is somewhat akin to that involved here was held unconstitutional in Thompson v. Shapiro, 270 F.Supp. 331, by a vote of two to one. With due deference and respect for these two courts, the decisions do not seem persuasive. In the Connecticut case Judge Clarie's dissenting opinion is more convincing than the majority view. Moreover, the Connecticut statute is quite different from the customary residence requirement. It excludes from the benefits of the welfare statute any person who comes into the State without visible means for support and applies for aid within one year after arrival. It is not a provision basing eligibility on residence alone. Neither the Delaware case, nor the Connecticut decision, consider the question of severability and whether striking down the residence requirement would invalidate the entire statutory scheme. Apparently that point did not come to the attention of either Court.

The Social Security Act is a comprehensive, far-reaching, progressive statute of epochal social and economic significance. It was framed on the basis of detailed studies by Committees created by the President. It was thoroughly and carefully considered by the Congress and its Committees. The legislation was the fruit of long and thorough studies and scrutiny on the part of numerous persons. The statute introduced social insurance into the United States on a large scale. Its beneficent contributory plans for compulsory old age insurance and for unemployment insurance accorded permanent economic security and independence to millions of persons who had lived in dread as what was to become of them in old age or in case of loss of employment for a lengthy period. The public assistance features of the legislation, such as aid to dependent children, which is involved in this legislation, were created as auxiliaries to the insurance

schemes. The basic constitutionality of the Act was sustained by the Supreme Court in the leading case of Helvering v. Davis, 301 U.S. 619, 672, 57 S.Ct. 904, 81 L.Ed. 1307. No feature of the statute has been invalidated until the present time.

If the decision of the majority stands, the provisions for aid to dependent children will be thrown into confusion and possibly destroyed. The entire District of Columbia legislation for public assistance likewise becomes a nullity. Such an outcome must be regretted.